UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

ALEXANDER HACHE,                          )
     Plaintiff,                          )
                                         )
v.                                        )
                                         ) C.A. NO. 1:20-cv-10652-PBS/JGD
AIG CLAIMS, INC., GRANITE STATE           )
INSURANCE COMPANY, and                    )
AMWINS PROGRAM UNDERWRITERS, INC.         )
     Defendants.                         )
_____ )

**PLAINTIFF'S OPPOSITION TO DEFENDANT AMWINS PROGRAM UNDERWRITER'S MOTION FOR SUMMARY JUDGMENT; AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE FIRST AMENDED COMPLAINT**

Plaintiff Alex Hache ("Hache") opposes the motion for summary judgment of Defendant AmWINS Program Underwriters ("APU"). APU argues it is entitled to summary judgment based on Hache's inability to establish an essential element of his c. 93A claim on two grounds: (1) He fails to offer any evidence that APU had a duty to make a reasonable offer of settlement on Hache's negligence claim in the Underlying Action because as a matter of law liability was never reasonably clear; and (2) He fails to offer any evidence that APU committed a willful or knowing violation of the c. 93A.

The first argument fails because APU misinterprets the law. The second argument fails because there is ample evidence in the record that APU committed a willful or knowing violation of c. 93A.

Hache cross-moves for summary judgment on Count II of the First Amended Complaint on the ground that there is no genuine dispute that APU committed a willful or knowing violation of c. 93A.

Plaintiff's Opposition to APU's Motion For Summary Judgment, and Plaintiff's Cross-Motion for Summary Judgment, is supported by the Affidavit of Jeffrey S. Raphaelson. Plaintiff's Opposition to APU's Motion For Summary Judgment is also supported by the Affidavit of Frederick J. Fisher, J.D., CCP.

## **INTRODUCTION**

Defendants seek to sweep under the rug their willful and knowing violations of cc. 176D and 93A by appealing to the Court's interest in preserving judicial resources, arguing that the Court ruled that Defendants are entitled to cap their damages on account of the settlement-offer, or safe harbor, defense, and therefore there is no good reason to conduct a needlessly "time consuming and costly trial proceeding." Doc. 158, p. 3 (APU Memorandum of Law).  Defendants press the argument even though: (a) neither claims Hache has no good faith appellate argument, or that justice somehow will be served by short-circuiting compelling claims that two global insurance industry companies engaged in willful or knowing violations of Massachusetts laws; and (b) one of them, AIG Claims, is an established serial offender. See Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 494-495, 961 N.E.2d 1067, 1075 (2012); Anderson v. Nat'l Union Fire Ins. Co., 88 Mass. App. 1117, 42 N.E. 3d 211 (Table), 2015 WL 9263925 (2015). Of course, a summary ruling that Defendants willfully or knowingly violated c. 93A would also serve their purpose.

## **DISPUTED MATERIAL FACTS**

Disputed: SF 2.  Hache disputes SF 2 to the extent that it suggests that Defendant AIG Claims did not have the ability to control the claims handling process, or did not in fact facilitate the claims handling once APU reported the claim, and to the extent SF 2 alleges

that AIG Claims role was to perform financial oversight only. See Hache SOF 2, 29, 35, 47-71.

Disputed: SF 22.   Hache disputes SF 22.  See Hache SOF 31-33.

Disputed: SF 23.   Hache disputes SF 23 to the extent that it claims anything more than counsel provided a written report of what counsel claimed Dr. Hebben told him.

Disputed: SF 51.   Hache disputes SF 51 to the extent that it mischaracterizes the second Major Loss Report, which speaks for itself.

Disputed: SF 53.   Hache disputes SF 51 to the extent that it is contradicted by AIG's interrogatory answers.  See Hache SOF 51.

Disputed: SF 54.   Hache disputes SF 54. See Hache SOF 31-33.

Disputed: SF 72-74.   Hache disputes the allegations, contained in SF 72-74, that Defendant AIG Claims or AmWINS made a settlement offer in compliance with c. 93A, that all three defendants tendered a "safe harbor offer, and that the responses of all three Defendants' "was reasonable in relation to the injury he allegedly suffered as a result of defendants' conduct in the Underlying Action."  Please see the grounds set forth in Hache's Opposition to AIG Claims' and APU's Motions for Summary Judgment on the Safe Harbor Defense, and in Hache's Objection to the Magistrate's Ruling, which Hache filed in this matter and incorporates herein.  Facts 69-74, moreover, are irrelevant to the motions before the Court, and Hache therefore moves to strike them.

### STATEMENT OF MATERIAL FACTS IN SUPPORT OF HACHE'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTIONS FOR SUMMARY JUDGMENT ON COUNT II OF THE FIRST AMENDED COMPLAINT

Hache hereby incorporates herein by reference the facts contained in paragraphs 1-77 of Plaintiff's Statement Of Material Facts In Support Of His Opposition To Defendants'

Motions For Summary Judgment and Plaintiff's Cross-Motions for Summary Judgment On
Counts II and III Of The First Amended Complaint.

## ARGUMENT

I.     **UNDER SETTLED LAW, APU HAD A DUTY TO MAKE PROMPT AND
REASONABLE OFFERS OF SETTLEMENT FOR THE UNDISPUTED INJURIES
IT KNEW ITS INSURED CAUSED HACHE TO SUFFER**.

APU completely misconstrues Calandro v. Sedgwick Claims Mgmt. Servs., 919 F.3d 26
(1st Cir. 2019), the case it primarily relies on. In Calandro, the First Circuit held that an
insurer's "duty to settle arises only when liability and damages for the underlying claim have
become reasonably clear. . . . Liability is not reasonably clear if an element in the underlying
claim is subject to good-faith disagreement." Id. at 34 (internal citations omitted).  APU
makes the remarkable argument that this holding relieves an insurer of any duty to make a
reasonable offer of settlement so long as the insurer disputes in good faith either the causal
connection between the insured's negligence and any claim of injury made by a plaintiff, or
the extent of harm from an undisputed injury. More specifically, APU maintains that because
it disputed Hache's claim that Wachusett caused Alex to suffer a brain injury and it disputed
the extent of the harm Alex suffered from the orthopedic injuries he sustained in the thirty
foot fall from Wachusett's chair lift, it had no duty to make a reasonable offer of settlement
at any time for the serious orthopedic injuries Wachusett did not dispute it caused Alex to
suffer.

The elements of a claim of negligence, generally, are (1) negligence, (2) the causal
connection between the defendant's negligence and the plaintiff's injury or damage; and (3)
damages. See Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 221-222, 914 N.E.2d 891,
898-899 (2009). "'Damages' is the word which expresses in dollars and cents the injury

sustained by a plaintiff." Id., quoting Turcotte v. DeWitt, 333 Mass. 389, 392, 131 N.E.2d 195 (1955).

In Calandro, the First Circuit held that liability was not reasonably clear on plaintiff's wrongful death claim because there was a good faith dispute as to the cause of plaintiff's decedent's death; did defendant's negligence cause it or did she die from pre-existing illnesses? Id. at 34-36. In other words, the Court held that there was an element of plaintiff's wrongful death claim that remained in dispute – the causal connection between defendant's negligence and the plaintiff's injury or damages. In contrast, the Court held that liability was reasonably clear on plaintiff's claim of conscious pain and suffering because, even though the parties disagreed on the dollars and cents of the pain and suffering (the extent of the harm that the plaintiff suffered), there was no dispute that defendant's negligence caused the Plaintiff's decedent to suffer consciously before she expired.  Id. at 37 ("Of course, Sedgwick concedes that liability was reasonably clear with respect to the plaintiff's claim for conscious pain and suffering").

The Calandro decision does not support, but instead undermines, APU's argument that if an insurer disputes the causal connection between the insured's negligence and any claim of injury made by a plaintiff, or disputes the extent of harm suffered by the plaintiff as a result of an injury admittedly caused by its insured's negligence, then the insurer is relieved of its c. 176D obligations as to all claims of injury made by the plaintiff, even those the insured clearly caused.

Two Massachusetts state court cases are instructive: McLaughlin v. American States Insurance Company, 90 Mass. App. Ct. 22, 55 N.E.3d 1007 (2016); and R.W. Granger & Sons v. J & S Insulation, 435 Mass. 66, 75-76, 754 N.E.2d 668, 677 (2001). In McLaughlin, the

Massachusetts Appeals Court held that the insurer had a duty under c. 176D to make a prompt and reasonable offer of settlement when the insured's fault and the causal connection to substantiated injury or damage were reasonably clear, even though the full extent of the harm had not yet developed.  Id. at 29-31 and n. 11. In McLaughlin, an independent adjuster hired by the insurer had submitted to the insurer his report which confirmed that plaintiffs' plantings had been killed or damaged by salt water pumped through the irrigation system supplied by the well the insured had drilled.  Id. at 30. The extent of the damage was substantiated by invoices supplied by the plaintiffs totaling more than $66,000. Id. "Additional invoices later supplied, as additional damage developed, increased the total to an amount of approximately $164,000." Id. and n. 11.  The Court held that the insurer had a duty under c. 176D to "promptly put a fair and reasonable offer on the table" where "the [insured's] liability for, at least, a failure to warn of the possibility of salt water contamination of the well, and the related need to monitor water quality, was reasonably clear as of May, 2004, and [the insurer] was aware of substantiated damages to plants valued at approximately $66,000 as of that time." Id. at 29-31.

The Massachusetts Supreme Judicial Court, in R.W. Granger & Sons v. J & S Insulation, 435 Mass. 66, 75-76, 754 N.E.2d 668, 677 (2001), held that even though a component of damages was uncertain, it did not relieve an insurer from its c. 176D obligation to make a prompt and reasonable offer of settlement where other components of damages to which it was responsible to pay were reasonable clear. Id. The Court rejected the insurer's claim that damages were not "reasonably clear" until the court resolved the parties' competing claims over the amount of attorney's fees. It was enough, the Court held, that it was reasonably clear the insurer was responsible to pay the verdict and interest. Id.

6

Under settled law, then, APU had a duty to make prompt and reasonable offers of settlement for the injuries it did not dispute Wachusett caused Hache to suffer, even if it disputed the causal connection between Wachusett's negligence and other injuries, and the extent of harm suffered by the plaintiff from the undisputed injuries. In the Underlying Action, there was no dispute that Alex sustained five fractured vertebrae, a fractured pelvis, and a concussion as a result of falling 30 feet from a Wachusett ski lift chair, physical therapy for and pain and suffering from the fractures, emotional pain and suffering associated with hanging from the chair lift for three minutes as the other chair riders gradually lost hold of him until he fell, and $50,000 of medical expenses, and that Wachusett was at fault for the harms. Well before the mediation in April 2018, liability and causation for these harms were reasonably clear. Consequently, under Calandro, McLaughlin, and R.W. Granger & Sons, APU had a duty to make reasonable offers of settlement at the parties' mediation in April 2018 and promptly thereafter.

It would significantly diminish, if not defeat, a principal purpose of G. L. cc. 176D and 93A if an insurer could refuse to make any offer of settlement whatsoever in a case in which an insurer conceded the plaintiff suffered substantial injury as a result of an insured's conduct, but disputed one of a plaintiff's injury claims or disputed the extent of the harm the plaintiff suffered as a result of an undisputed injury.   See Clegg v. Butler, CITE at 419 (citation omitted) ("The statutes at issue were enacted to encourage the settlement of insurance claims ... and discourage insurers from forcing claimants into unnecessary litigation to obtain relief").  For example, if APU's interpretation of Calandro were correct, a plaintiff who suffers paraplegia admittedly caused by a defendant would have cc. 176D and 93A rights against the insurer, but a plaintiff who suffers paraplegia admittedly caused by a

7

defendant but who also makes a brain injury claim that is disputed would have no cc. 176D and 93A rights against the insurer. Per APU, this would be the correct result even if the insurer valued the paraplegia claim well in excess of its policy coverage limit.

Applying the same logic, APU argues that because it "hotly contested" Alex's claim of damages for his "persistent orthopedic difficulties" (Doc. 158, APU Memorandum, p. 2) and "orthopedic difficulty claims," (Doc. 158, APU Memo, p. 9, n. 5), which APU claims "evolv[ed]" for "more than three years following his well-documented recovery from the fractures sustained in the ski lift fall," it had no c. 176D obligation to make a reasonable offer of settlement because Alex's damages were not reasonably clear. That logic would gut the statutory framework. Disputes over the extent of harm caused by personal injuries may impact what constitutes "a reasonable offer" under the statute, but does not relieve an insurer from making the offer altogether.  Where all of the elements of a negligence claim are undisputed – negligence and causation leading to injury -- an insurer has a duty to make prompt and reasonable offers of settlement for the undisputed injury.[1]

In this case, APU had a duty to make reasonable offers of settlement at the parties' mediation in April 2018, three years after Alex fell, and promptly thereafter, for the five fractured vertebrae, the fractured pelvis, the concussion, the emotional pain and suffering

---

[1] While it is immaterial to APU's c. 176D obligation to make a prompt and reasonable offer, it is worth noting that APU's description of "persistent orthopedic difficulties" is in fact a description of chronic injury from the five fractured vertebrae and fractured pelvis. In his deposition in January 2017, about two years after he fell, Alex testified that he still experienced pain from his injuries. In May 2017, Alex's mother testified that he continued to experience pain in his legs and back, sometimes had difficulty bending over, had trouble walking and running and sometimes could not run, and couldn't play contact sports or ski. In November 2018 plaintiff's counsel informed defense counsel that Alex would testify at trial that he suffered from ongoing and persistent pain in his back since the fall. At trial in July 2019, Alex explained he had experienced back stiffness and discomfort every day since he fell more than four years earlier, an allegation that Wachusett's only orthopedic expert, Matthew Werger, MD, found "absolutely" credible in his trial testimony (See Statement Of Material Facts In Support Of Plaintiff's Opposition To Defendants' Motions For Summary Judgment And Plaintiff's Cross-Motions For Summary Judgment On Count II And III Of The First Amended Complaint ("Hache SOF"), no. 6).

associated with hanging from the chair lift, the physical therapy, the medical expenses associated with Alex's care and treatment totaled approximately $50,000, and Alex's pain and suffering associated with the orthopedic injuries.

The other cases cited by APU are readily distinguishable. In <u>Lief-Socolow v. Plymouth Rock Assurance Corporation</u>, 93 Mass. App. Ct. 1104, *6-7 (2018), a Rule 1:28 opinion, the Massachusetts Appeals Court ruled that the offers made by the insurer were reasonable, not that the insurer had no duty to make an offer ("The difference between the offer made and the amount awarded did not violate G. L. c. 93A where PRAC relied on medical expert opinions that contested damages."). In <u>Silva v. Norfolk & Dedham Mutual Fire Insurance Company</u>, 91 Mass. App. Ct. 413, 75 N.E.3d 1132 (2017), the Massachusetts Appeals Court held that the insurer "had a reasonable basis for resisting liability" where it was reasonable for the insurer to question the causal relationship between the automobile accident and plaintiff's claimed injuries. <u>Id.</u> at 417-418 (the information obtained by the insurer "cast[] doubt on the genuineness of [plaintiff's] claimed injuries, leading the insurer "to doubt [plaintiff's] general veracity and be suspicious of . . . his claims of bodily injury"). Similarly, in <u>O'Leary-Alison v. Metro. Prop. & Cas. Ins. Co.</u>, 52 Mass. App. Ct. 214, 217-218, 752 N.E.2d 795, 798 (2001), the issue was a genuine dispute over causation ("the judge found that Metropolitan had multiple reasons to be skeptical of O'Leary-Alison's damage claims because an independent medical examiner found no physical condition warranting treatment, other medical reports were either equivocal or did not reveal any abnormalities, the accident was a low impact collision, she did not complain of any pain or injury at the scene of the accident, and she continued working months after the accident"). In the instant case, in contrast, APU had no reason to doubt that Hache was injured in the 30-foot fall from

the ski lift chair, and there was no reason to question the allegation that Wachusett's negligence caused Alex to suffer serious personal injury.

## II.     There Is Compelling Evidence In The Record That APU Committed A Willful Or Knowing Violation Of C. 93A.

APU argues it is entitled to summary judgment on Hache's claim that APU committed a willful or knowing violation of c. 93A on the ground that Hache fails to offer any evidence of any such violation (Doc. 158, p. 16).  To the contrary, there is compelling evidence in the record that APU acted willfully or knowingly.

The Massachusetts Supreme Judicial Court, in <u>Kourouvacilis v. General Motors Corp.</u>, 410 Mass. 706, 714, 575 N.E.2d 734, 739 (1991), stated the summary judgment standard applicable to AIG's Motion For Summary Judgment on Count III of the First Amended Complaint:

> "The Supreme Court made clear that a party who moves for summary judgment has the burden of initially showing that there is an absence of evidence to support the case of the nonmoving party shouldering the burden of proof at trial. That burden is not sustained by the mere filing of the summary judgment motion or by the filing of a motion together with a statement that the other party has produced no evidence that would prove a particular necessary element of this case. The motion must be supported by one or more of the materials listed in rule 56 (c) and, although that supporting material need not negate, that is, disprove, an essential element of the claim of the party on whom the burden of proof at trial will rest, it must demonstrate that proof of that element at trial is unlikely to be forthcoming.

An insurance company commits an unfair claim settlement practice if it "[f]ail[s] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." <u>Rhodes v. AIG Domestic Claims, Inc.</u>, 461 Mass. 486, 494-495, 961 N.E.2d 1067, 1075 (2012), quoting G. L. c. 176D, § 3 (9) (f). "[A]ny person whose rights are affected by another person violating the provisions of [G. L. c. 176D, § 3 (9) (f),]" is entitled to bring an action to recover for the violation under G. L. c. 93A, § 9. <u>Id</u>. "If there is a finding in such

an action that the insurer has failed to effectuate a prompt, fair, and equitable settlement causing injury, the plaintiff is entitled to the greater of actual damages or statutory damages of twenty-five dollars." Id., citing G. L. c. 93A, § 9 (3). "However, if the judge finds the insurer's action was wilful **or** knowing, the judge must grant double or treble damages." Id. (Emphasis added).

"[W]hether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." Chervin v. Travelers Ins. Co., 448 Mass. 95, 112, 858 N.E.2d 746 (2006). "Chapter 93A does not define what constitutes an "unfair or deceptive act or practice." Such a definition would be impossible, because, as the Appeals Court aptly noted, "there is no limit to human inventiveness in this field." ... [U]nfair or deceptive conduct is best discerned " 'from the circumstances of each case.' " Kattar v. Demoulas, 433 Mass. 1, 13-14, 739 N.E.2d 246, 257 (2000), quoting Commonwealth v. DeCotis, 366 Mass. 234, 242 (1974). In a case involving unfair or deceptive insurance practices, "the evidence likely will focus on insurance industry practices in similar circumstances, expert testimony that the insurer violated sound claims practices, the LLJUA's field investigation, and advice given to the LLJUA on the probability of success at trial." Bolden v. O'Connor Cafe of Worcester, Inc., 50 Mass. App. Ct. 56, 67, 734 N.E.2d 726, 735 (2000).

"To be wilful or knowing, a violation [of c. 93A] need not be malicious, but must constitute more than negligence. Within that range is conduct that is "intentionally gainful," . . . or demonstrates a wilful recklessness or conscious, knowing disregard for its likely results . . . ." Rass Corporation v. The Travelers Companies, Inc., 90 Mass. App. Ct. 643, 657, 63 N.E.3d 40, 53 (2016) (internal citations omitted). "[T]he term 'wilful' can be equated with reckless conduct. Kattar v. Demoulas, 433 Mass. 1, 16, 739 N.E.2d 246, 259 (2000), citing Still

v. Commissioner of the Dep't of Employment & Training, 423 Mass. 805, 812-813, 672 N.E.2d

105 (1996) ("Decisions construing the multiple damages provisions of G. L. c. 93A have

imposed such damages for 'wilful' or 'knowing' violations, equating the former with reckless

conduct and the latter with intentional acts").

"An act is done 'knowingly' if it 'is [the] product of conscious design, intent or plan

that it be done, and is done with awareness of probable consequences." Still v. Commissioner

of Empl. & Training, 423 Mass. 805, 812-813, 672 N.E.2d 105, 111-112 (1996), quoting

Black's Law Dictionary 872 (6th ed. 1990). "An insurer knowingly violates c. 93A and c.

176D when liability is reasonably clear yet it still fails to settle within a reasonable time."

Gore v. Arbella Mut. Ins. Co., 77 Mass. App. Ct. 518, 532, 932 N.E.2d 837, 849-850 (2010),

citing Cohen v. Liberty Mut. Ins. Co., 41 Mass. App. Ct. 748, 756, 673 N.E.2d 84

(1996) (affirming a finding that the insurer knowingly violated c. 93A where the insurer

"had reason to know of its liability for [the claimant's] claim under its insurance policy with

[the insured] several months prior to its receipt of [the claimant's] G. L. c. 93A demand letter,

yet it failed to settle [the claimant's] claim or tender its policy at that time or for more than

a year thereafter"); see also Rhodes v. AIG Domestic Claims, Inc., 78 Mass. App. Ct. 299, 304-

305, 937 N.E.2d 471, 476 (2010)  (double damage appropriate where defendant "AIGDC did

not delay its settlement offer to conduct the investigation needed to make liability

reasonably clear; it delayed it because it thought it would be in a better strategic posture if

the offer were postponed until the mediation and it did not wish the mediation to occur until

trial was nearly imminent.");[2] R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 435 Mass.

---

[2] AIGDC did not appeal the trial court's willful and knowing finding. In its appeal to the SJC, the Court noted "AIGDC does not contest here the judge's findings that its conduct before and after the entry of judgment in the tort action constituted knowing and wilful violations of c. 176D, § 3 (9) (f), and c. 93A, § 9. AIGDC's lack of contest is

77 (2001) (double damages appropriate where the judge found surety's inexplicable delay in settling after verdict against its principal in underlying action forced additional litigation on bond for nearly a year and necessitated a hearing at which surety put forth no viable defense).

There is compelling evidence in the record that APU acted in willful or knowing violation of cc. 176D and 93A when it failed to make a reasonable investigation of Alex's claims before the parties' mediation on the case on April 3, 2018 and failed to make a fair and equitable offer of settlement at the mediation and for six months thereafter until late October 2018, one month before the trial scheduled in late November 2018.

By the time of the parties' mediation in April 2018, three years after the accident, Wachusett fault for the accident was reasonably clear. The primary responsibility of the lift attendant, Dylan Wilson, was to watch the chair loading to make sure each chair loaded safely (Hache SOF 3, 4). If Wilson had done so, he would have seen twelve-year old Alex obviously misload the chair and heard the other riders' yells to stop the lift (Hache SOF 3, 4). Based primarily on the riders' accounts, and citing Wachusett's violation of Massachusetts regulations, the DPH concluded that Wachusett was responsible for the accident (Hache SOF 3 and 4). Defendants never possessed any admissible evidence from any source that Alex failed to use due care when loading the chair.[3] Before the mediation, APU' trial log reported

---

reasonable, because the trial record provides ample support for the judge's findings"). Rhodes, supra, 461 Mass. at 495, n. 15.

[3]In January 2017, Alex testified in his deposition that he didn't know exactly what happened that led him to sit on the arm of the chair, but when he tried to sit down there was no space between him and Mr. Lavigne, the rider to his immediate left (Hache SOF 3; Exhibit 3, p. 61). The mere happening of an accident does not allow an inference of negligence. Spano v. Wilson Tisdale Co., 361 Mass. 209, 212 (1972) ("mere happening of an accident . . . where the circumstances immediately preceding it are left to conjecture, is not sufficient to prove negligence"). The applicable Massachusetts regulation, 526 CMR 10:08, entitled "Rider's Responsibility," moreover, says nothing about loading the chair, and there is no evidence in the record that Alex violated any of the listed responsibilities in the regulation. Depositions taken of the three other chair riders

"liability is likely" (Hache SOF 22, 40-41; Exhibit 7, pp. 8-11).  After the mediation and during which time no new additional facts bearing on fault emerged, APU prepared two Major Loss Reports that reported liability was likely (Exhibits 23; 32).

 Furthermore, the lift attendant on duty when Alex loaded the chair, Dylan Wilson, had not received the lift attendant training that Wachusett considered necessary and appropriate when he attended Alex's chair, and three days after the accident Corey Feeley, Wachusett's head of training, fabricated Wachusett's training records to conceal Wilson's lack of training. Wachusett produced the fabricated training record in the litigation and committed perjury in its 30 (b) (6) deposition to cover up the fraud. At least six months before the mediation, APU had full knowledge of the training record fabrication and perjury (Hache SOF 11-14). West admitted the record fabrication and perjury, which he learned about six months before the mediation, made it virtually impossible for Wachusett to mount a credible defense to Plaintiff's allegation that Wachusett's negligence caused the accident (Hache SOF 15, 38). Six months after the mediation, during which time no new additional facts bearing on fault emerged, Wachusett admitted liability.[4]

Well before the mediation, it was undisputed that Alex suffered serious personal injuries as a result of Wachusett's negligence. There were no genuine dispute that: Alex suffered emotional trauma during and as a result of hanging from the ski lift chair for about three minutes while his fellow chair riders gradually lost hold of him and then fell 30 feet to the ground below; Alex sustained five fractured vertebrae and a fractured pelvis as a result

---

later in 2017, before September, confirmed their earlier witness statements that they knew of no lack of care on Alex's part (Hache SOF 4; Exhibit 2, pp. 6-7).

[4] Lead defense counsel, Richard Shea, summarized the lack of any genuine defense to Hache's negligence claim in an email in November 2018.  All the facts that he references in the email were known to APU at the time of the mediation (Hache's SOH 38-41).

of the fall; Alex was hospitalized for three days; Alex underwent physical therapy in 2015, 2016 and 2017, that he testified in his deposition in January 2017 that he continued to experience pain in his back as result of the vertebral injuries (or in other words that he had chronic pain from the fall), and that his mother testified in May 2017 that he continued to experience pain in his legs and back, sometimes had difficulty bending over, had trouble walking and running and sometimes could not run, and couldn't play contact sports or ski; Alex suffered a concussion or mild traumatic brain injury in the fall; and the medical expenses associated with his care and treatment totaled more than $50,000 (Hache SOF 6).

There is compelling evidence that before the mediation, despite knowing Wachusett was at fault for the accident and that Alex had sustained serious injuries as a result, APU willfully or knowingly disregarded its duty to conduct a reasonable investigation of Alex's claim based on available information.

First. Before the mediation, West deliberately disregarded Wachusett's counsel's advice on a fair settlement range for the case ($450,000 to $600,000) and attended the mediation with only the limit of his authority of $75,000 (Hache SOF 20, 26, 30).

Second. Before the mediation, West knowingly failed to notify his boss, Richard Donahue, about the claim in violation of APU's protocol to bring to Donahue's attention claims that could exceed West's authority of $75,000, and he knowingly failed to notify AIG Claims in violation of the Claims Services Agreement ("CSA") (Hache SOF 21, 23). West knew the claim clearly had "a potential settlement value" greater than $150,000 (or even $250,000), which triggered the notice requirements under the terms of the CSA (Hache SOF 22).

Third. Before the mediation, West knew the fair value of the claim substantially exceeded his limit of authority, or had reckless disregard for the fact. In addition to ignoring defense counsel's advice, in October 2018 West told Mr. Donahue that he wouldn't be surprised by a verdict on the claim of anywhere between $150,000 and $5 million, and he told Mr. Kilcline of AIG Claims that he felt $500,000 reflected the value of the claim (Hache SOF 32-33). Between the April 2018 mediation and October 2018 the parties exchanged expert designations regarding Alex's brain injury claim, the only new damages information developed during that time, but Mr. West testified that he didn't credit the brain injury claim at any time (Hache SOF 33).

Fourth. Before the mediation, West formed the conclusion that Alex made a "good recovery" from his orthopedic injuries, and didn't investigate Alex's sworn testimony in January 2017 that he continued to suffer pain from his five vertebral fractures and pelvis fracture, or his mother's sworn testimony in May 2017 that he continued to experience pain in his legs and back, sometimes had difficulty bending over, had trouble walking and running and sometimes could not run, and couldn't play contact sports or ski. (Hache SOF 6, 24). The only orthopedic expert Defendants engaged, Matthew Werger, M.D., testified in 2019 that all of Alex's physical therapy visits, both the visits before the mediation in 2015, 2016 and 2017 and the visits after the mediation in 2018 and 2019, were causally related to the fall and that Alex's trial testimony that he suffered back discomfort and stiffness every day of his life after the accident was "absolutely" credible (Hache SOF 57).

Fifth. Before the mediation, West told Wachusett's counsel Matthew Sweet that Mrs. Hache was significantly exaggerating the value of the claim and, in order to convince her to settle for a low figure at the mediation (to "set an appropriate tone"), insisted that Sweet file

a lawsuit against her despite Sweet's advice that the lawsuit was meritless. Mr. West told Sweet, "having to answer a complaint, even if dismissed," will help leverage a settlement (Hache SOF 25).

Sixth. Before the mediation, West approved Wachusett's mediation strategy to continue the charade that all of Wachusett's personnel were properly trained, despite knowing that Dylan Wilson, the lift attendant on duty when Alex fell, had not received the training Wachusett required and considered appropriate for all lift department personnel. In other words, West approved a litigation strategy that perpetuated the fraud and perjury at least through the mediation in order to keep alive Wachusett's claim of contributory negligence in an effort to try to settle the case on more favorable terms at the mediation than the terms Wachusett would have faced had it disavowed the fraud and perjury and admitted liability (100% responsibility) before the mediation as it repeatedly tried to do after the mediation and before trial  (Hache SOF 16-19).

Seventh. Before the mediation, West did not investigate the likely impact of the fabricated training record and the 30 (b) (6) perjury on the credibility of Wachusett's defense and likely verdict (Hache SOF 37). After the judge denied Wachusett's motion to keep out the misconduct from the trial in November 2018, defense counsel advised West and AIG Claims that in his opinion the likely jury verdict would be in the mid-seven figures once the jury heard about the fraud and perjury, rather than the mid-six figures they had advised earlier, because of the risk that the jury would credit Hache's experts and discredit Wachusett's experts on Hache's brain injury claim (Hache SOF 37-40). AIG Claims personnel responsible for the primary policy credited defense counsel's assessment and increased the reserve on the primary policy to its limit of $1 million (Hache SOF 42). Ms. Skiba testified

17

that when she approved reserve increases, she performed an independent valuation and approved an increase only if she believed the request comported with her own value of the claim (Hache SOF 50). If, before the mediation, APU investigated the likely impact of the fabricated training record and the 30 (b) (6) perjury on the credibility of Wachusett's defense and the verdict, it would have been required to attribute some meaningful value to the risk that the misconduct would be admitted into evidence.

At the mediation, APU's offer of $15,000 to settle the claim, followed by a refusal to increase the offer in the face of a reduction in the amount of the demand from $10 million to $9 million, constituted a patently unreasonable lowball offer (Hache SOF 26). At that time, the value of the undisputed damages substantially exceeded $15,000. The medical expenses alone, which were never disputed, were $50,000 (Hache SOF 6). Alex, moreover, had sustained 5 fractured vertebrae and a fractured pelvis in the 30-foot fall from the ski lift chair, along with a concussion and the emotional trauma of hanging from the chair for three minutes while his fellow riders gradually lost hold of him. He had suffered physical pain from and had undergone physical therapy for the fractured vertebrae and pelvis before the mediation in 2015, 2016 and 2017 (Hache SOF 6).  He testified in his deposition in January 2017 that he was still experiencing (chronic) pain from his injuries, a claim substantiated by his mother's testimony in May 2017 (Hache SOF 6). APU's orthopedic expert Matthew Werger, MD agreed in 2019 that all of Alex's physical therapy visits – in 2015, 2016, 2017, 2018 and 2019 – were related to the fall and that he "absolutely" credited Alex's testimony that he felt back stiffness and discomfort every day for more than 4 years from the day of the fall until the trial. (Hache SOF 6, 57). See R.W. Granger & Sons, 435 Mass. at 82 (wilful violation of statute where fault clear and inexplicable delay in making offer on damages to

which no viable defense was later put). The jury did not hear about the misconduct, but still returned a $3.25 million verdict on the case resulting, with interest, in a $4.56 million judgment (Hache SOF 72). Cf. Silva v. Steadfast Insurance Company, 87 Mass. App. Ct. 800, 807 (2015) (subsequent appellate and post-judgment litigation confirmed the reasonableness of insurer's actions, as plaintiff's claims were once again determined to be without merit and the amount of damages required multiple adjustments in the trial court).

In further support of Hache's Opposition to APU's Motion for Summary Judgment on Count II of the First Amended Complaint, Hache states that, in the opinion of Plaintiff's expert, Frederick J. Fisher, J.D., CCP, APU acted contrary to sound insurance claims handling standards or in complete disregard of those standards when it failed to: (a) conduct a reasonable investigation of Alex's claim based on available information; (b) make a reasonable offer of settlement at the mediation; (c) make any offer of settlement for six months following the mediation, until one month before the trial date; and (d) request further settlement authority and make a fair and equitable offer of settlement promptly after AIG Portfolio Solutions Group head Karen Skiba approved the increase in the reserve on the primary policy from $500,000 to $1 million on February 5, 2019 (unless AIG Claims instructed APU not to do so) (Hache SOF 73-76).

Mr. Fisher also holds the opinion that Alex's ongoing and persistent pain and discomfort from five fractured vertebrae for four years between ages 12 and 17 would have indicated significant value to a reasonable insurer handling the claim, and that APU's failure to timely investigate or credit Alex's claim of chronic problems from his vertebral injuries violated sound claims handling practices (Hache SOF 77).

**PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Alex Hache ("Hache") submits this memorandum in support of Plaintiff's Cross-Motion For Summary Judgment On Count II Of The First Amended Complaint. Hache relies on the Affidavit of Jeffrey S. Raphaelson in support of this cross-motion.

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF HACHE'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTIONS FOR SUMMARY JUDGMENT ON COUNTS II OF THE FIRST AMENDED COMPLAINT**

Hache hereby incorporates herein by reference the facts contained in paragraphs 1-77 of Plaintiff's Statement Of Material Facts In Support Of His Opposition To Defendants' Motions For Summary Judgment and Plaintiff's Cross-Motions for Summary Judgment On Counts II and III Of The First Amended Complaint.

**ARGUMENT**

For the reasons set forth hereinabove, there is no genuine dispute that APU committed a willful or knowing violation of cc. 176D and 93A.

WHEREFORE, Plaintiff Alex Hache requests that the Court:

> (a) Deny APU's Motion for Summary Judgment on Count II of the First Amended Complaint; and
>
> (b) Grant Plaintiff's Cross-Motion for Summary Judgment on Count II of the First Amended Complaint.

Respectfully submitted,
 ALEXANDER HACHE,

By his attorney,

*/s/ Jeffrey S. Raphaelson*
Jeffrey S. Raphaelson
BBO# 552459
Raphaelson Law
11 Foster Street, Suite 308
Worcester, MA 01608
(617) 204-9800
jsr@raphlaw.com

Dated: March 6,  2023

**CERTIFICATE OF SERVICE**

I, Jeffrey S. Raphaelson, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) with paper copies sent to any non-registered participants on this 6th day of March 2023.

*/s/ Jeffrey Raphaelson*
Jeffrey Raphaelson