UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALEXANDER HACHE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 20-CV-10652-PBS |
| AIG CLAIMS, INC., GRANITE STATE | ) | |
| INSURANCE COMPANY, and AMWINS | ) | |
| PROGRAM UNDERWRITERS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

September 12, 2023

DEIN, U.S.M.J.

### I.   INTRODUCTION

This action arises out of a lawsuit (the "Underlying Action") that was filed in

Massachusetts Superior Court by Heidi Hache, individually and as next friend to her son,

plaintiff Alexander Hache ("Alex" or "Hache"), against Wachusett Mountain Ski Area, Inc.

("Wachusett").  By her claims in the Underlying Action, Heidi Hache was seeking to hold

Wachusett liable for serious injuries that Alex sustained on March 8, 2015 when, at the age of

twelve, he fell more than twenty feet from a moving chairlift.  On July 16, 2019, following a five-

day trial, a jury returned a $3,275,000 verdict in Hache's favor, and on July 19, 2019, the state

court entered judgment in the amount of $4,560,105,20.

At the time of Alex's fall, and throughout the course of the Underlying Action,

Wachusett was insured under a $1 million commercial general liability insurance ("CGL") policy

that had been issued by the defendant, Granite State Insurance Company ("Granite State"), and

was part of a MountainGuard Program that was managed and administered for Granite State

by defendant AmWINS Program Underwriters, Inc. ("AmWINS"), with financial oversight and

supervision from defendant AIG Claims, Inc. ("AIG").  After Granite State and Wachusett's

excess liability insurer paid their respective portions of the judgment, Hache's counsel sent

formal demand letters to Granite State, AmWINS and AIG in which he accused the insurers of

engaging in unfair settlement practices, in violation of Mass. Gen. Laws ch. 176D ("Chapter

176D") and Mass. Gen. Laws ch. 93A ("Chapter 93A"), by failing to conduct a reasonable

investigation regarding Hache's claims against Wachusett and failing to effectuate a prompt,

fair and equitable settlement of his claims after Wachusett's liability became reasonably clear

in the Underlying Action.  He further demanded that each of the insurers make a reasonable

offer of settlement to resolve his Chapter 93A claims.  Although the insurers tendered a

settlement offer in the amount of $113,389.14 in addition to amounts previously paid, Hache

did not respond to the offer, and on February 18, 2020, he filed the instant lawsuit against AIG,

Granite State and AmWINS by which he is seeking to hold each of the defendants liable for

damages under Chapter 93A.[1]

The matter is presently before the court on the "Defendants' Motion for Summary

Judgment" (Docket No. 153) and "AmWINS Program Underwriter, Inc.'s Motion for Summary

Judgment" (Docket No. 157), by which the defendant insurers are seeking judgment as a matter

of law with respect to Hache's Chapter 93A claims against them.  It is also before the court on

---

[1] "General Laws c. 93A, § 9(1), specifically provides that 'any person whose rights are affected by another person violating the provisions of [G.L. c. 176D, § 3(9)] may bring an action.'"  Clegg v. Butler, 424 Mass. 413, 414 n.3, 676 N.E.2d 1134, 1136 (1997).

Hache's cross-motions for summary judgment (Docket Nos. 163, 164 & 179), by which the plaintiff is seeking judgment as a matter of law with respect to his Chapter 93A claims against AIG and AmWINS.[2]  As detailed below, this court finds that Hache has failed to present sufficient facts to show that the defendants failed to conduct a reasonable investigation of the plaintiff's claims in the Underlying Action.  This court further finds, based on the undisputed facts presented on summary judgment, that at all times relevant to the plaintiff's Chapter 93A claims, the nature and extent of Alex's injuries were strongly contested by the parties and Wachusett's liability for the harm remained unclear.  Therefore, and for all the reasons described below, this court recommends to the District Judge to whom this case is assigned that the defendants' motions for summary judgment be ALLOWED and that Hache's cross-motions for summary judgment be DENIED.

## II.  <u>STATEMENT OF FACTS</u>

### <u>Scope of the Record</u>

In connection with the pending motions for summary judgment, the parties have filed various motions by which they have sought, *inter alia*, to strike or otherwise limit the scope of the factual assertions and expert testimony that has been filed with the court.  Those motions have been addressed in a separate Memorandum of Decision and Order on Motions Filed by the Parties in Connection with Their Cross-Motions for Summary Judgment issued on this date.

---

[2] Hache's cross-motions for summary judgment are set forth in his oppositions to the defendants' motions for summary judgment (Docket Nos. 163 & 164), as amended by Plaintiff's Amendments to His Summary Judgment Opposition and His Summary Judgment Cross-Motions in Accordance with the Court's Orders at Document Nos. 176 and 177 (Docket No. 179).  Although the plaintiff filed his cross-motions after the deadline for filing any motions for summary judgment had expired, this court subsequently allowed Hache's motion to amend retroactively the deadlines for filing cross-motions for summary judgment.  (<u>See</u> Docket Nos. 192 & 203).  Accordingly, the plaintiff's cross-motions are timely.

As detailed therein, this court has allowed the plaintiff's motion to withdraw the report of his expert witness, Frederick J. Fisher, J.D., CCP, and has stricken paragraphs 73-82 of the plaintiff's Statement of Material Facts, which are based on Mr. Fisher's opinions.[3]  This court has also agreed to disregard the parties' factual assertions to the extent they are irrelevant, fail to comply with Rule 56(c) of the Federal Rules of Civil Procedure and/or fail to comply with Local Rule 56.1.  However, this court has denied the parties' motions to the extent they have sought to limit other aspects of the evidentiary record, which remains highly detailed and challenging to analyze due to the extensive nature of the plaintiff's Statement of Material Facts and the numerous objections set forth in the defendants' responses thereto.  The following facts represent this court's careful scrutiny of the parties' factual statements and responses, as well as the underlying evidence.[4]  It also reflects this court's effort to provide a fair description of the relevant material facts that are, and are not, genuinely in dispute.

---

[3] Following a hearing on the motions for summary judgment, the parties filed supplemental briefs addressing the impact of the plaintiff's decision to withdraw Mr. Fisher's expert opinions on the outcome of the pending motions.  The supplemental materials indicate that Hache was relying on Mr. Fisher's report to support his claim that the defendants' violations of Chapters 176D and 93A were willful or knowing.  (See Docket No. 221).  Because this court finds that it is not necessary to reach the issue whether the defendants' conduct was willful or knowing, this court finds that there is no need to address the parties' supplemental filings at this time.

[4] Unless otherwise set forth in this court's Memorandum of Decision and Order on Motions Filed by the Parties in Connection with Their Cross-Motions for Summary Judgment issued on this date, the facts described herein are derived from the following materials: (1) Defendants' Local Rule 56.1 Statement of Facts in Support of Their Motion for Summary Judgment ("AIG SOF") (Docket No. 155); (2) the Affidavit of William A. Schneider ("Schneider Aff.") and the exhibits attached thereto ("AIG Ex. _") (Docket No. 156); (3) AmWINS Program Underwriter Inc.'s Local Rule 56.1 Statement of Facts in Support of its Motion for Summary Judgment ("AmWINS SOF") (Docket No. 159); (4) the Affidavit of Barbara O'Donnell in Support of AmWINS Program Underwriter's Summary Judgment Motion ("O'Donnell Aff.") and the exhibits attached thereto ("AmWINS Ex. __") (Docket No. 160); (5) the plaintiff's response to AmWINS SOF ("PR AmWINS SOF"), which is set forth in pages 2-3 of the Plaintiff's Opposition to Defendant AmWINS Program Underwriter's Motion for Summary Judgment; and Plaintiff's Cross-Motion for Summary Judgment on Count II of the First Amended Complaint (Docket No. 163); (6) the plaintiff's response to AIG SOF ("PR AIG SOF"), which is set forth on page 3 of the Plaintiff's Opposition to

## Circumstances Giving Rise to the Underlying Action

On March 8, 2015, Alex, who was then twelve years old, sustained serious injuries while attempting to board a high-speed chairlift known as the "Polar Express" at the Wachusett Mountain Ski Area.  (AIG SOF ¶ 1; Pl. Ex. 2 at CM/ECF Page 5 of 34).[5]  The accident occurred when Alex attempted to sit down on a chair as it was moving through the loading area.  (See Pl. Ex. 3 at 61).  Because there was no space available between Alex and rider to his immediate left, Alex was forced to sit down on the arm of the chair instead of the seat.  (See id.).  He then began sliding off the chair as it began to ascend the mountain.  (See id.).  Although other skiers yelled for the lift attendant to stop the lift, the attendant, Dylan Wilson, failed to stop it quickly enough to save Alex from falling.  (Pl. Ex. 2 at CM/ECF Pages 6-7 of 34).  It is undisputed that Alex remained hanging from the chair for about three minutes before falling more than twenty feet to the trail below.  (See Raphaelson Aff. ¶ 3; Pl. Ex. 2 at CM/ECF Pages 5 & 31 of 34).

---

Defendant AIG Claims, Inc.'s Motion for Summary Judgment; and Plaintiff's Cross-Motion for Summary Judgment on Count III of the First Amended Complaint (Docket No. 164); (7) the Affidavit of Jeffrey S. Raphaelson ("Raphaelson Aff.") and the exhibits attached thereto ("Pl. Ex. __") (Docket No. 165); (8) the Statement of Material Facts in Support of Plaintiff's Opposition to Defendants' Motions for Summary Judgment and Plaintiff's Cross-Motions for Summary Judgment on Count II and III of the First Amended Complaint ("PF") (Docket No. 166); (9) the Response of AIG Claims, Inc. and Granite State Insurance Company to Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment and Cross-Motions for Summary Judgment on Count II and III of the First Amended Complaint ("DR") and the exhibits attached thereto ("AIG Supp. Ex. __") (Docket No. 182); (10) the exhibits attached to the Affidavit of John T. Harding in Support of AmWINS Program Underwriters, Inc.'s Reply Memorandum in Support of its Motion for Summary Judgment and Cross-Motion Opposition ("AmWINS Supp. Ex.__") (Docket No. 185); and (11) AmWINS Program Underwriters, Inc.'s Response to Plaintiff's Statement of Facts in Support of Opposition to Defendants' Summary Judgment Motions and Plaintiff's Cross-Motions ("AR") (Docket No. 188).

[5] Citations to page numbers refer to the page numbers of the parties' exhibits.  Citations to CM/ECF page numbers refer to the court's numbering system located at the top right of the exhibits.

Following his fall, Alex was treated at an area hospital for multiple injuries, including a broken pelvis, compressed vertebrae and a severe concussion.  (Pl. Ex. 2 at CM/ECF Page 5 of 34).

Shortly after the accident, the Massachusetts Department of Public Safety ("DPS") conducted an investigation regarding the circumstances surrounding Alex's accident.  (Pl. Ex. 2 at CM/ECF Pages 3-34 of 34).  As set forth in an Incident Report describing its investigation, DPS concluded that Wachusett violated Massachusetts regulations governing the use of chairlifts by failing to advise and assist riders as required, failing to load riders on the chairlift while observing and monitoring the loading area, and failing to enter required information regarding the incident in Wachusett's Daily Operational Log.  (Id. at CM/ECF Page 8 of 34).  It also concluded that Wachusett violated a Massachusetts statute governing the duties of ski area operators by failing "to maintain the ski area in a 'reasonably safe condition or manner.'"  (Id. (quoting Mass. Gen. Laws ch. 143, § 71N(6)).  As described below, Wachusett disputed these assertions.

At the time Alex's accident occurred, and at all times relevant to the instant case, Wachusett was insured under a $1 million primary CGL policy (the "Primary Policy") that had been issued by defendant Granite State under a ski insurance program known as the "MountainGuard Program."  (AmWINS SOF ¶ 2; PR AmWINS SOF ¶ 2; AIG SOF ¶ 2).  It is undisputed that Granite State has no employees that perform claim-handling functions and that defendant AIG acts on its behalf.  (PF ¶ 1; DR ¶ 1; AR ¶ 1).  It is also undisputed that AmWINS administered claims that were made under the MountainGuard Program.  (See AIG SOF ¶¶ 3-4; PR AIG SOF ¶¶ 4-5; AmWINS SOF ¶ 2; PR AmWINS SOF ¶ 2).  Thus, under the terms of a Claims Service Agreement ("CSA") between AmWINS and a group of insurance companies

that included Granite State (collectively, the "Insurers"), AmWINS agreed to act as a Third Party Administrator with responsibility for carrying out "Claims Adjusting Services." [6]  (See AIG Ex. 3 at CM/ECF Pages 1 and 8 of 46).  This included, among other responsibilities, the investigation, adjustment, settlement and payment of claims in accordance with the authority granted by the Insurers.  (See id. at CM/ECF Pages 4-6 of 46).

Significantly, the CSA provided that Richard Donahue ("Donahue"), a Vice President of AmWINS, would "have General Liability reserve and settlement authority of $250,000.00."  (Id. at CM/ECF Page 41 of 46).  It also provided that AmWINS "has Settlement Authority on claims that are within the Reportable File threshold.  When a claim becomes a Reportable File, [AmWINS] does not have Settlement Authority on the claim and all claim settlements must be approved in writing by [the Insurer]."  (Id. at CM/ECF Page 42 of 46).  The CSA described "Reportable Files" as including "all claims that have a potential settlement value greater than "$150,000[.]"  (Id. at CM/ECF Page 40 of 46).  As detailed below, during at least a portion of the time period when the Underlying Action remained pending, the potential settlement value of Hache's claim against Wachusett exceeded both the Reportable File threshold and Donahue's authority.

The record is less clear regarding the nature and extent of AIG's role with respect to claims made under the Primary Policy.  According to the defendants, AIG's responsibilities were limited to financial oversight, which involved the approval of AmWINS' requests for financial authority but did not involve claims handling activities such as claim investigation, evaluation or

---

[6] Although the "Third Party Administrator" named in the CSA is Willis of New Hampshire, Inc., it is undisputed that AmWINS was the Third Party Administrator under the agreement during the relevant time period.  (See Schneider Aff. ¶ 12; AIG SOF ¶ 5).

settlement negotiations.  (See AIG Am. Mem. at 3-6; AmWINS SOF ¶ 2).[7]  However, Hache

disputes the defendants' characterization of AIG's responsibilities and asserts that AIG

maintained control over the claims handling process, including decisions over when to make a

settlement offer and how much to offer.  (See PR AmWINS SOF ¶ 2; PF ¶¶ 2, 29, 34-35).  As

described below, this court finds that it is unnecessary to resolve this dispute because AIG has

shown that even if it was responsible for claims handling, it is entitled to summary judgment

with respect to Hache's claims that it engaged in unfair claim settlement practices.

At the time of Alex's accident in 2015, Wachusett was also insured under a commercial

umbrella liability insurance policy that had been issued by National Union Fire Insurance of

Pittsburgh, PA ("National Union") and provided $24 million in excess coverage (the "Excess

Policy").  (AIG SOF ¶ 8; PF ¶ 1).  It is undisputed that AIG served as the sole claim administrator

for the Excess Policy.  (AIG SOF ¶ 9).  However, the individuals who handled claims under that

Policy and the individuals who acted on behalf of Granite State with respect to the Primary

Policy worked in different divisions of AIG.  (Id.; see also DR ¶ 1).  Hache has not asserted any

claims against National Union and does not allege that National Union engaged in unfair claim

settlement practices in connection with the Underlying Action.

In April 2015, approximately one month after Alex's accident, AmWINS opened an

investigation of the matter.  (AmWINS SOF ¶ 3).  The case was assigned to Dylan West ("West"),

an Assistant Vice President of AmWINS with experience in handling claims under the

MountainGuard Program.  (Id.).  West reported directly to Donahue.  (Id.).  Although Hache had

---

[7] "AIG Am. Mem." refers to the Amended Memorandum of Law in Support of Motion of Defendants'
Motion for Summary Judgment (Docket No. 216).

not yet asserted any claims against Wachusett, AmWINS authorized Wachusett to retain

Attorneys Matthew Sweet and Rick Shea from the law firm of Hamel Marcin Dunn Reardon &

Shea, P.C. ("Hamel Marcin") to assist it in responding to the DPS investigation.  (Id. ¶ 4).  It is

undisputed that by October 2015, West had received a copy of the DPS report in which the DPS

concluded that Wachusett had failed to comply with state law and regulations pertaining to ski

areas.  (PF ¶ 5; see also Pl. Ex. 2 at CM/ECF Page 8 of 34).  At the time West received the report,

AmWINS' own investigation into the accident was ongoing and it considered Wachusett's

liability to remain "[q]uestionable."  (AmWINS Ex. C at 13-14).

### Initiation of the Underlying Action

On April 12, 2016, Heidi Hache, individually and as next friend to her son Alex, filed the

Underlying Action against Wachusett in state Superior Court.  (AmWINS SOF ¶ 1).  Therein,

Hache sought to hold Wachusett liable "for negligently operating its ski area, causing then

twelve year old [Alex] to fall from a ski lift and suffer severe and permanent injuries."  (Pl. Ex. 11

at 1 (footnote omitted)).  The plaintiff alleged that those injuries included five fractured

vertebrae, a broken pelvis, chronic pain, depression and a permanent brain injury.  (See Pl. Ex. 4

at 39; Pl. Ex. 5; Pl. Ex. 8 at CM/ECF Pages 2-3 of 55; Pl. Ex. 9 at CM/ECF Pages 10-11 of 27).

Wachusett disputed liability, as well as the nature and extent of Hache's alleged damages.  (Pl.

Ex. 13 at 1).  The record establishes that West continued to investigate Hache's claims and

monitor the factual and legal developments throughout the course of the Underlying Action.

(See AmWINS Ex. C; Pl. Ex. 30).

During discovery in the Underlying Action, Hache produced records regarding the

medical treatment Alex received as a result of his fall.  Those records showed that Alex was first

seen at the University of Massachusetts Medical Center in Worcester, where he was admitted immediately following the accident and diagnosed with a fractured pelvis, compression fractures in his spine, and "a closed head injury and concussion with loss of consciousness." (AmWINS SOF ¶ 5; AmWINS Ex. D at CM/ECF Page 27 of 373).  He was released after two days in stable condition, with a prescription of Oxycodone for pain.  (Id. at CM/ECF Pages 25-27 of 373).  Upon discharge, Alex was instructed to follow up with Pediatric Surgery, Orthopedics and the facility's Concussion Clinic.  (Id. at CM/ECF Page 27 of 373).

The medical records also showed that on March 25, 2015 and April 6, 2015, Alex was seen by Robert Cantu, M.D., a neurosurgeon at the Emerson Hospital Concussion Clinic in Concord, Massachusetts, for an initial consultation and follow-up regarding his concussion. (AmWINS SOF ¶ 6; AmWINS Ex. E).  Dr. Cantu noted that Alex had suffered a prior concussion in January 2015, when he was hit by a snowboarder while skiing.  (AmWINS Ex. E at CM/ECF Page 36 of 373).  He also noted that Alex initially experienced symptoms from that concussion but they cleared up within a few hours and no lingering symptoms were present the next day.  (Id.). At the appointment on March 25, 2015, Dr. Cantu conducted an examination and concluded that Alex was experiencing symptoms as a result of his fall on March 8, 2015.  (See id. at CM/ECF Pages 36-37 of 373).  Those symptoms included an inability to recall six digits forwards or backwards, an inability to recite serial eights in his head correctly and some impairment in his ability to balance.  (Id.).  Dr. Cantu reported that he would allow Alex to remain in school "but ask that he be given no exams and allowed to do homework only as tolerated."  (Id. at CM/ECF Page 37 of 373).

During Alex's second visit with Dr. Cantu on April 6, 2015, Dr. Cantu completed another examination of the plaintiff.  (See id. at CM/ECF Pages 34-35 of 373).  This time, Dr. Cantu determined that all of Alex's tests were normal and that he had no remaining symptoms.  (Id. at CM/ECF Page 34 of 373).  As Dr. Cantu reported:

> I believe that [Alex] is over his concussion.  He still has to be cleared by his spine specialist for his pelvic and thoracic fractures regarding resuming more vigorous activities and I will leave that in the hands of that individual.  From the concussion standpoint, though, he can resume full schoolwork and full testing without restriction.  Return with me will be left to be on [an as needed] basis.

(Id. at CM/ECF Page 35 of 373).  There is no evidence that Hache received any further medical treatment for complaints of cognitive injuries resulting from his ski accident for two years following the accident.  (See AmWINS SOF ¶ 9).

According to Alex's medical records, Alex and his mother met with Danial J. Hedequist, M.D. in the Orthopedic Department at Boston Children's Hospital on May 13, 2015 for a follow-up appointment regarding Alex's physical injuries.  (AmWINS Ex. F).  During the appointment, Alex's mother reported that Alex was doing well and had been able to mow the lawn, although he was not engaging in sports and had some pain with lifting.  (Id.).  Dr. Hedequist performed a physical examination and confirmed that Alex was "doing well."  (Id.).  Significantly, Dr. Hedequist found that Alex was walking with a normal gait; had no pain with hyperextension, lateral bending or lateral rotation; and that his pelvic motion was "normal at the hips with no pain with compression."  (Id.).  He also noted that Alex's x-rays "showed healed fracture, stable position."  (Id.).  Dr. Hedequist recommended physical therapy for stretching and strengthening but did not recommend further follow-up except on an "as needed" basis.  (Id.).

[11]

Alex's deposition in the Underlying Action took place in January 2017.  (AmWINS SOF ¶ 12).  Alex testified that he had missed a month of school as a result of the accident in March 2015, and that he continued to have a lot of back pain throughout much of 2015.  (AmWINS Ex. H at 49-50).  He also testified that he was still experiencing back pain but was able to participate on his school's indoor track team and run cross-country in the fall.  (Id. at 50-51).  When asked about his concussion, Alex testified that he had a lot of difficulty in school in the period following the accident, but that his grades and ability to learn had improved.  (Id. at 53).  He further stated that he had experienced memory loss as a result of the concussion, which impacted his schoolwork.  (Id. at 49, 53).

Heidi Hache, Alex's mother, also testified in a deposition that was held in 2017.  (Pl. Ex. 31).  During her deposition, Heidi Hache stated that Alex was experiencing headaches, pain in his pelvis and severe pain in his legs as a result of the accident.  (Id. at 48-49).  She also testified that Alex was having difficulty walking, running and bending over, as well as memory loss and trouble with concentration.  (Id. at 50-52).  According to Ms. Hache, Alex's physical limitations prevented him from playing contact sports or skiing, and restricted his ability to "play rough with his friends."  (Id. at 53).  She further stated that Alex's cognitive impairments were interfering with his schoolwork, and that his grades had not improved since the date of his accident.  (Id. at 51-53).

In February 2017, Alex underwent a neuropsychological evaluation, which was performed by Neal McGrath, Ph.D., a neuropsychologist at Sports Concussion New England in Brookline, Massachusetts.  (Pl. Ex. 9 at CM/ECF Page 1 of 27).  Dr. McGrath diagnosed Alex with a "Diffuse Traumatic Brain Injury with Loss of Consciousness of 30 minutes or less" and "Mild

Neurocognitive Disorder Due to Traumatic Brain Injury[.]"  (Id. at CM/ECF Page 11 of 27).  He

concluded that "Alex sustained traumatic brain injuries in January 2015 and March 2015 with

the second injury being much more significant and resulting in ongoing neuropsychological

impairments, including in the areas of attention, working memory, new learning and executive

function"; that Alex likely "sustained permanent brain injury as a result of the fall from the

chairlift" at Wachusett; and that Alex "will require academic accommodations to address his

neuropsychological deficits for the duration of his education."  (Id. at CM/ECF Pages 10-11 of

27).  Dr. McGrath recommended, among other things, that in addition to reasonable academic

accommodations, Alex obtain cognitive rehabilitation at the Cantu Concussion Center at

Emerson Hospital.  (Id. at CM/ECF Page 11 of 17).  Hache's counsel provided Wachusett's

defense counsel with a copy of Dr. McGrath's report of his neuropsychological evaluation on

May 25, 2017.  (AmWINS SOF ¶ 13).  Subsequently, AmWINS authorized the retention of a

medical expert to support Wachusett's defense.  (Id. ¶ 15).

It is undisputed that Alex returned to the Concussion Center at Emerson Hospital where

he met with Dr. Cantu for follow-up evaluations on June 5, 2017 and July 31, 2017.  (Id. ¶ 14).

In his notes from the June 5, 2017 evaluation, which were produced during discovery in the

Underlying Action, Dr. Cantu reported in relevant part as follows:

> The patient returns to the concussion clinic today because he has been
> instructed by Neal McGrath to come to the clinic for cognitive therapy.  I last saw
> and followed this young man in 2015.  All of his concussion symptoms have
> cleared with the exception of persistent difficulties with concentration and
> memory.  He has been tested most recently, 2/2015 by Neal and has been
> shown to have as a result of his 2 brain injuries some persistent deficit including
> impairments in the areas of attention working memory, new learning, and
> executive functioning ....

(AmWINS Ex. J at CM/ECF Page 83 of 373).  Dr. Cantu diagnosed Alex as having "Postconcussion

syndrome with cognitive deficits."  (Id. at CM/ECF Page 84 of 373).  He further stated that Alex

would be referred to cognitive therapy and be given a trial of Vasper therapy.  (Id.).

In his notes from Alex's second follow-up appointment on July 31, 2017, which also

were produced during discovery in the Underlying Action, Dr. Cantu wrote in relevant part as

follows:

> The patient has done well since last seen.  He is working as a bagger at Market
> Basket on the weekends and is enjoying it.  His symptom load has dropped to 1,
> which is purely memory.  No longer issues with concentration at least as he and
> his mother perceive it.  He obviously is out of school though and how he will do
> with school work, especially involving algebra and language, which are his 2
> tough subjects.  It will require getting into the fall to actually find out.

(Id. at CM/ECF Page 85 of 373).  Dr. Cantu further reported that Alex would not be proceeding

with the Vasper therapy, and that he would not put any accommodations in place unless it

became clear that Alex needed them.  (Id. at CM/ECF Pages 85-86 of 373).

Notably, during discovery in the Underlying Action, Wachusett produced training

records showing that Dylan Wilson ("Wilson"), the chairlift attendant on duty at the time of

Alex's accident, had undergone "Bullwheel" training.  (PF ¶ 11).  "Bullwheel" training was one

of two types of training that Wachusett used to train chairlift operators and attendants.  (Pl. Ex.

10 at 51).  The other type of training was hands-on training.  (Id.).  Both Bullwheel and hands-on

training focused on customer safety.  (Id.).  During his deposition pursuant to Fed. R. Civ. P.

30(b)(6), Wachusett's corporate designee, Corey Feeley ("Feeley"), testified that the training

records were authentic and that Wilson had been properly trained to operate the chairlift.  (PF

¶ 11; Pl. Ex. 11 at CM/ECF Page 2 of 5).  However, it is undisputed that Wilson's training records

were fabricated and that Feeley had falsified the records to make it appear that Wilson had

received the proper training.  (PF ¶¶ 11-12).  It is also undisputed that the individual responsible for providing Wilson with hands-on training, Paul Perkins, was not at work on the day Wilson allegedly received that training.  (Id. ¶ 13).  As described below, Feeley's fabrication of the training records and false deposition testimony ultimately caused Wachusett to concede liability for negligence in the Underlying Action.  However, the nature and extent of Alex's injuries and resulting damages remained a point of contention between the parties to the litigation.

### Events Leading Up to the Parties' April 3, 2018 Mediation

By early September 2017, the parties to the Underlying Action had agreed to participate in a mediation, which was scheduled to take place in November 2017.  (AmWINS SOF ¶ 16).  It is undisputed that AmWINS had authority to reserve and settle claims with respect to the MountainGuard Program up to $250,000, but that any reserve increase and/or settlement above that amount had to be submitted to AIG for review and approval.  (Id. ¶¶ 17-18).  It is also undisputed that West did not bring Hache's claim to Donahue's attention and that AmWINS did not seek settlement authority from AIG in connection with the mediation.  (See PF ¶ 23).  Furthermore, there is no evidence that AmWINS reported Hache's claim to AIG until October 22, 2018, more than six months after the mediation occurred.

At the time the mediation was arranged, AmWINS' reserve for Hache's claim was $75,000.  (AmWINS SOF ¶ 19).  On or about October 30, 2017, Wachusett's defense counsel at Hamel Marcin provided AmWINS with a liability and damages analysis in preparation for the

mediation.[8]  (Pl. Ex. 12 at 1).  The analysis included a detailed description of the evidence in the

case, as well as opinions regarding Wachusett's potential liability and an assessment regarding

a potential settlement range.  (See generally Pl. Ex. 12).  It also noted that based on the billing

records that had been provided in the case, Hache had incurred approximately $50,000 in

medical bills as a result of Alex's injuries.  (Id. at 8).

Notably, Hamel Marcin's analysis included a summary regarding the initial opinion of Dr.

Nancy Hebben, a neuropsychologist who had been retained by Wachusett as an expert witness.

(Id. at 9-10).  As defense counsel described therein, Dr. Hebben did not believe, after reviewing

Alex's medical records, that Alex sustained a concussion during his collision with a snowboarder

in January 2015, or after his fall from the chairlift in March 2015.  (Id. at 9).  She explained that

the diagnoses lacked support in the medical records and were undermined by Alex's deposition

testimony.  (Id.).  According to Hamel Marcin, Dr. Hebben believed that Alex's injuries lasted

only two to three months following his fall from the chairlift, resulted solely from the pelvic

fracture and compression fractures, and that there was no evidentiary support for Hache's

claim that Alex sustained long-lasting effects from his alleged injuries.  (Id.).  Dr. Hebben

characterized Dr. McGrath's expert report as "science fiction" that was not supported by any

facts, evidence or science, and noted that Dr. McGrath's opinion was inconsistent with Dr.

---

[8] The defendants originally withheld certain of the exhibits relied on by the parties in connection with
their summary judgment motions, including Hamel Marcin's October 30, 2017 liability and damages
analysis, on the grounds that they were protected by the attorney-client privilege and work product
doctrine.  However, Hache was able to obtain those documents through Wachusett's October 2021
production of its file from the Underlying Action, which occurred in connection with a separate
proceeding in state court.  (See, e.g., AmWINS SOF ¶ 20).  In February 2022, the defendants filed
motions for a protective order to preclude Hache's use of any privileged documents in this action that
had been produced by Wachusett in the state court matter.  (See Docket Nos. 123 & 124).  This court
denied those motions in an Order on Defendants' Motions for Protective Order dated June 15, 2022.
(Docket No. 135).

Cantu's report that Alex was back to normal, with the ability to resume all activities, less than a

month after the accident.  (Id.).  Additionally, Dr. Hebben explained that "any long-term effects

of a concussion would not be apparent during a neuropsychological evaluation two years

following the subject accident [,]" and that there was nothing in the scientific literature showing

that concussions cause permanent memory loss.  (Id.).  Finally, she found that Dr. McGrath's

report was inconsistent with Alex's academic record, which showed that there was no statistical

difference between the grades he received before and after the accident.  (Id. at 9-10).

In connection with its assessment of Wachusett's potential liability, Hamel Marcin

stated that

> [b]ased on the discovery obtained, in particular the written statements of
> Wachusett personnel involved [in] this accident, it appears that Wachusett and its
> employees exercised reasonable care in the operation of Wachusett and, in
> particular, the Polar Express Lift.  The Plaintiffs will likely have a difficult time
> supporting any claims with regard to a lapse in lift operation, ski patrol responses,
> or any equipment malfunction.

(Id. at 14).  Nevertheless, Hamel Marcin did express concern that evidence from non-party

witnesses, if believed "could create liability issues in this case for Wachusett."  (Id.).

Additionally, defense counsel acknowledged the risks stemming from Feeley's fabrication of the

chairlift operator's training records.  (Id.).  Thus, as Wachusett's counsel explained in the report:

> We also believe that there are some potentially damaging credibility issues that
> Wachusett will face at trial in connection with the pre-incident Bullwheel training
> which was not actually completed by Mr. Wilson.  As detailed above, although Mr.
> Feeley testified that Mr. Wilson received Bullwheel training prior to the subject
> incident under the username "jshepard," it has since been discovered that Mr.
> Shepard was employed by Wachusett and completed the Bullwheel training.
> Further, it was more recently discovered that Mr. Feeley just three days following
> the subject accident, changed the display name for the username jshepard from
> Jacob Shepard to Dylan Wilson with Bullwheel, and that Mr. Wilson actually
> completed the Bullwheel training at that time.  The appearance of an attempt by

[17]

Wachusett to "cover up" the lack of training received by Mr. Wilson could present some major credibility issues for Wachusett that will likely not play well to a jury.

(Id.).

Despite these issues, Hamel Marcin emphasized that Wachusett would "present a very credible defense to the Plaintiffs' claims and dispute liability[.]"  (Id. at 15).  It also emphasized that "Plaintiffs' claims with regard to the alleged neuropsychological impairments currently suffered by Alex due to the subject incident [were] exaggerated and unsupported by the evidence."  (Id.).  In the valuation section of the Report, defense counsel expressed their opinion that "a settlement range of $450,000 to $600,000 may be required to allow for a resolution of this matter at mediation.  This range is likely higher than what Alex's case is worth (likely closer to the $200,000 to $250,000 range)."  (Id.).  Nevertheless, Hamel Marcin cautioned that Hache and his attorneys were likely to be "'emboldened' by the credibility issues" surrounding Feeley's fabrication of Dylan Wilson's training records.  The November 2017 mediation was postponed at the plaintiff's request in order to give Wachusett and its representatives an opportunity to review new information concerning Hache's damages claim, and rescheduled for April 3, 2018.  (AmWINS SOF ¶¶ 26-27; see also PF ¶ 20; AIG SOF ¶ 14).

Although it is undisputed that AmWINS did not alert AIG about Hache's claim prior to the parties' mediation (PF ¶ 23), the record establishes that on March 16, 2018, Linda Demeritt, a Claims & Loss Control Coordinator in the MountainGuard Program, forwarded a "Trial log" to Edwin Kilcline, the Director of AIG's Portfolio Solutions Group, the AIG entity responsible for the MountainGuard Program.  (Pl. Ex. 7 at CM/ECF Pages 8-11 of 27; see also PF ¶ 34; DR ¶ 34).  The Trial log provided in relevant part that "Plaintiff fell approximately 25-30 feet to ground and sustained a fractured pelvis, fractured vertebrae (no paralysis) and a concussion.  Good

recovery.  Liability is likely and disagreement exists over nature and extent of damages/claim value[.]"  (PF ¶ 24; AR ¶ 24; DR ¶ 24).  It also reflected a $75,000 liability reserve on the Primary Policy.  (AR ¶ 24; DR ¶ 24).

On about March 19, 2018, approximately two weeks before the rescheduled mediation, Hache presented a written report from Randall R. Benson, M.D., a neurologist and the Vice President and Medical Director for the Center of Neurological Studies.  (AmWINS SOF ¶ 27; AmWINS Ex. L ).  Therein, Dr. Benson opined that Alex sustained a traumatic brain injury ("TBI") as a result of his accident on March 8, 2015, and was continuing "to experience symptoms directly caused by his injury."  (AmWINS Ex. L at 20).  He also stated that "it is now apparent, almost three years post-accident, that Mr. Hache has suffered permanent, disabling cognitive disability as a result of the TBI he suffered 03/08/15[,]" and "[t]he argument that Mr. Hache's symptoms are anything other than related to a brain injury is completely unfounded."  (Id. at 25).  Dr. Benson's specific findings and conclusions, which were described in detail in his report, were based on his review of Alex's medical records; a Comprehensive Medical Evaluation that was performed on December 6, 2017 and included interviews with Alex and his mother; Alex's educational records; and brain imaging scans using a technology known as Diffusion Tensor Imaging ("DTI").  (See generally AmWINS Ex. L; AmWINS SOF ¶ 27).  As described below, Wachusett ultimately retained an expert witness who criticized Dr. Benson's use of the DTI technology and his resulting conclusions.

On or about March 21, 2018, Hamel Marcin provided West with a copy of a Confidential Mediation Overview that had been given to the mediator ahead of the April 3, 2018 mediation. (PF ¶ 16; Pl. Ex. 13 at CM/ECF Page 5 of 5).  Therein, defense counsel emphasized in relevant

part that "Wachusett adamantly disputes both liability and the nature and extent of the

Plaintiff's alleged damages."  (Pl. Ex. 13 at 1).  Hamel Marcin further stated that "Wachusett

took all reasonable and necessary steps to ensure that the operation of the lift was safe for

riders by ensuring that employees were properly trained and acted in accordance with industry

safety standards."  (Id. at 4).  Defense counsel did not address Feeley's fabrication of Dylan

Wilson's training records or otherwise indicate that the lift operator had not completed the

training program prior to the accident.[9]  (See id.).

The parties to the Underlying Action exchanged no settlement offers or demands prior

to the mediation, which took place on April 3, 2018 as scheduled.  (AmWINS SOF ¶ 28; AIG SOF

¶ 14).  AmWINS continued to maintain a $75,000 reserve on Hache's claim at that time even

though Hamel Marcin had recommended a settlement range of $450,000 to $600,000.  (PF ¶

26; see also Pl. Ex. 12 at 15).  As West testified in the instant case, while he did not discredit the

liability and damages analysis that had been prepared by defense counsel, he did not rely on

their assessment because he considered it the job of the adjuster to independently evaluate

the case.  (Pl. Ex. 14 at 110-12).  Prior to the mediation, West believed $150,000 was a

reasonable settlement range for the case, with each party bearing responsibility for 50 percent

of the liability.  (AmWINS Ex. BB at 47-49, 69, 105).  Accordingly, West was willing to negotiate a

---

[9] According to the Massachusetts Appeals Court, Hache has not shown that Wachusett's statement
regarding proper training was false.  See Hache v. Wachusett Mountain Ski Area, Inc., 102 Mass. App. Ct.
1117, 209 N.E.3d 79 (Table), 2023 WL 3028230, at *3 (Mass. App. Ct. Apr. 21, 2023).  As that court has
explained, during a post-trial evidentiary hearing before the state trial court, Wachusett's president and
chief executive officer, James Francis Crowley, testified that "even though Wilson had not received the
online training at the time of [Hache's accident], Wachusett still considered him to be 'properly trained'
because online training was 'above and beyond what most ski areas do.'"  Id.

settlement up to $75,000 based upon his independent evaluation regarding the value of the case at the time.  (Pl. Ex. 14 at 132-33).

During the mediation, Hache made an initial settlement demand of $10 million and AmWINS made a counteroffer of $15,000.  (PF ¶ 26; AmWINS SOF ¶ 29).  Hache then reduced the demand to $9 million but AmWINS refused to raise its offer and the mediation ended shortly thereafter.  (PF ¶ 26).  At issue in the instant case is whether, at the time of the mediation, Wachusett's liability was reasonably clear such that AmWINS was required to make Hache a reasonable offer of settlement.  (See AIG SOF ¶ 15).  For the reasons detailed below, this court concludes that no reasonable factfinder could conclude that Wachusett's liability was reasonably clear at the time of the mediation because, at a minimum, the issue of Hache's damages remained highly contested.

## Developments Following the Failed Mediation

On June 11, 2018, Attorney Sweet sent an email to West at AmWINS and Jeff Crowley at Wachusett regarding Dr. Stephen Sarfaty, a neuropsychologist who had been retained on behalf of Wachusett following the parties' unsuccessful mediation.  (AmWINS SOF ¶ 30; AmWINS Ex. M).  Therein, Attorney Sweet stated that Dr. Sarfaty had completed an initial review of Alex's medical records and could say "with a great deal of confidence that there is absolutely no basis whatsoever to conclude that Alex sustained a permanent brain injury/neurological impairment/psychological impairment[.]"  (AmWINS Ex. M).  He also asked for input as to whether to incur the cost of having Dr. Sarfaty conduct an independent medical examination ("IME") of Alex.  (Id.).

Two days later, on June 13, 2018, West responded to Attorney Sweet's email to express his view that Dr. Sarfaty should conduct an IME.  (Pl. Ex. 7 at CM/ECF Page 6 of 27).  In his response, West emphasized the importance of taking precautions to mitigate damages in light of the efforts of Hache's counsel to develop the case into one involving TBI and the plaintiff's demand for $9 million in settlement.  (Id.).  He also reminded Attorney Sweet and Mr. Crowley that "because of the actions and testimony of [Wachusett's] employee, Corey Feeley, we have virtually no ability to defend the liability allegations.  Further, if he is allowed to testify, I believe this opens up Wachusett to the potential of a punitive award which are not insurable in Massachusetts."  (Id.).

Hache's neuropsychological expert, Dr. McGrath, met with Alex on July 5, 19 and 26, 2018 to perform a neuropsychological re-evaluation.  (AmWINS SOF ¶ 32; AmWINS Ex. N). Based on his evaluation, Dr. McGrath confirmed a diagnosis of "Diffuse Traumatic Brain Injury with Loss of Consciousness of 30 minutes or less" and "Mild Neurocognitive Disorder Due to Traumatic Brain Injury." (Pl. Ex. 9 at CM/ECF Page 26 of 27).  He also reported that while the re-evaluation showed "indications of further recovery for Alex during his third year post-injury[,]" he was experiencing "[a] very specific persisting deficit in the area of auditory working memory" that "continues to undercut his efficiency in new auditory learning[.]" (Id.). Moreover, Dr. McGrath reiterated his prior conclusions that Alex sustained TBIs in January and March 2015, "with the second injury being much more significant and resulting in ongoing neuropsychological impairments, including in the areas of attention, working memory, new learning and executive functioning"; that Alex likely "sustained permanent brain injury as a result of the fall from the chair [lift] in March 2015"; and that "Alex will continue to require

reasonable academic accommodations to address his neuropsychological deficits for the duration of his education." (Id.).  Hache provided defense counsel with a copy of Dr. McGrath's report in August 2018.  (See AmWINS SOF ¶ 32).

On August 8, 2018, Wachusett's counsel at Hamel Marcin provided AmWINS with an updated liability and damages analysis that was intended to serve as a supplement to its pre-mediation analysis.  (Id. ¶ 33; AmWINS Ex. O at 1).  The analysis included a section entitled "Critical Liability Issues" in which defense counsel expressed the view, based on the discovery obtained in the case, that "Wachusett and its employees exercised reasonable care in the operation of Wachusett and, in particular, the Polar Express Lift."  (AmWINS Ex. O at 16).  Hamel Marcin further advised AmWINS that Wachusett's liability expert would provide further support for this view and that Hache was likely to have difficulty proving any lapse in Wachusett's operation of the chairlift, the ski patrol's response or the functioning of Wachusett's equipment.  (Id.).  On the other hand, Hamel Marcin expressly acknowledged the "potentially damaging credibility issues that Wachusett will face at trial in connection with the pre-incident Bullwheel training which was not actually completed by Mr. Wilson[,]" and advised AmWINS that "[t]he appearance of an attempt by Wachusett to 'cover up' the lack of training received by Mr. Wilson ... will likely not play well to a jury."  (Id.).

In connection with a discussion of the critical damages issues presented in the case, Hamel Marcin described Hache's alleged injuries as follows:

> [t]he plaintiff alleges that he sustained a fractured pelvis, multiple compression fractures in his back, and a closed head injury.  The Plaintiff also alleges that he sustained a concussion, and as a result, began to allegedly suffer from a number of neuropsychological impairments.  The Plaintiff further alleges that as a result of his physical injuries he began to suffer from depression, post-traumatic stress disorder, cognitive and physical impairments, difficulties with his school work, and

[23]

loss of enjoyment and/or the inability to participate in many of the activities he used to enjoy prior to the accident.

(Id. at 17).  Hamel Marcin characterized these alleged injuries as "exaggerated and entirely unsupported by any objective evidence."  (Id.).  Furthermore, it described evidence from the medical records and Alex's own testimony that undermined the plaintiff's alleged claims regarding the nature and extent of his harm, and confirmed that based on the billing records provided by the plaintiff, the Haches had incurred approximately $50,000 in medical bills for treatment stemming from Alex's injuries.  (See id. at 17-19).

In the "evaluation" section of its August 8, 2018 analysis, Hamel Marcin briefly discussed the unsuccessful mediation that had taken place on April 3, 2018.  (Id. at 20).  According to defense counsel, the mediation ended shortly after the parties presented opening statements and plaintiff's counsel "revealed for the first time that his demand to resolve [the] matter was $9,000,000" due to "the disparity between Plaintiff's counsel demand and our evaluation of the case[.]"  (Id.).  Defense counsel further explained that "[t]his case has become a 'battle of the experts'" in which each party has retained experts favorable to its case.  (Id. at 21).  Hamel Marcin advised AmWINS that "[a]t this point in time we objectively feel that our experts [are] stronger than the Plaintiff's" and it would "continue to supplement our evaluation of the potential expert testimony as expert discovery proceeds."  (Id.).  Finally, in the "Resolution Strategy" section of its analysis, defense counsel stated:

> Plaintiff's settlement demand of $9,000,000 has prevented the occurrence of any realistic settlement discussions.  This is far afield of any reasonable value of this claim.  You will recall that, prior to the mediation, we felt that a reasonable settlement range would be $450,000 to $600,000.  We continue to believe that this is a reasonable value for this claim.  The only way this claim gets into 7 figures and beyond is if the jury hears the testimony about the alleged "cover up" by Wachusett of the Bullwheel documentation and issues a verdict to "punish"

> Wachusett.  Ultimately, this may be why we will want to attempt to stipulate to
> liability at the time of trial.  In order for the stipulation to be put in place, Plaintiff
> must agree to it and we fully expect that they will vigorously oppose this attempt.
> We would be hopeful that the judge would permit the stipulation in order to save
> judicial resources by significantly reducing the length of the trial.  There may also
> be an opportunity as trial draws closer to reengage Plaintiff's counsel in more
> realistic settlement discussions, which we suggest may be warranted given the
> problematic testimony we will need to grapple with on the liability front.

(Id.).

Subsequently, Wachusett and its counsel proceeded to engage in the development of expert testimony.  On September 18, 2018, Dr. Sarfaty provided defense counsel with a written report describing his reasons for concluding that Alex did not sustain a brain injury or suffer any psychological impairment as a result of his March 8, 2015 accident.  (AmWINS SOF ¶ 39).  Additionally, on October 2, 2018, Hamel Marcin obtained a written report from Martha Shenton, Ph.D., the Director of the Psychiatry Neuroimaging Laboratory at Brigham and Women's Hospital in Boston, Massachusetts.  (See id. ¶¶ 40-41).  Defense counsel had retained Dr. Shenton to address the use of DTI imaging technology by Hache's expert, Dr. Benson, to support his conclusion that Hache sustained a TBI as a result of his accident.  (Id. ¶ 40).  In her report, Dr. Shenton noted that "DTI is not standardized for use" in clinical settings and that the American College of Radiology has not approved it for use at the individual patient level. (AmWINS Ex. Q at 21).  She also described the problems associated with the use of DTI, as well as specific problems with Dr. Benson's testing.  (See id. at 14-21).  Dr. Shenton concluded that these issues rendered Dr. Benson's conclusions "overstated, speculative, uninterpretable and not valid."  (Id.).

**Circumstances Surrounding Wachusett's November 2018 Settlement Offer**

Between the April 2018 mediation and late October 2018, AmWINS made no further offer of settlement in the Underlying Action.  (PF ¶ 27).   On or about October 22, 2018, West sent Donahue a Major Loss Report ("MLR") along with the August 8, 2018 liability and damages analysis from Hamel Marcin.  (AIG Ex. 4 at CM/ECF Pages 3-5 of 27).  The MLR indicated that AmWINS was seeking to increase the liability reserve with respect to Hache's claim to $500,000.  (See id. at CM/ECF Pages 4-5 of 27).  Donahue forwarded the documents to Mr. Kilcline at AIG.  (Id. at CM/ECF Pages 2-3 of 27).  At the time of these events, the trial in the Underlying Action had been set for November 26, 2018.  (AIG SOF ¶ 19).

The record establishes that on October 23, 2018, Donahue sent an email to West in which he questioned West's delay in bringing Hache's claim to his attention as follows: "Since April you knew the demand was $9M and a reasonable settlement number was $500-600k?  And this pretrial report [from Hamel Marcin] is over 2 months old?  Why did it take so long?"  (Pl. Ex. 7 at CM/ECF Page 7 of 27).   In his reply a short time later, West provided the following explanation:

> A demand is not an indication of value and up until the point we realized that the one witness (Corey Feely) submarines the entire case, I felt this was a defensible case with a likely comparative fault result (50/50).  Based upon the non-displaced hip fracture, I was comfortable with the indemnity reserve.  The demand came during the May mediation and I have been gathering expert medical records to document the alleged damages.
>
> I still [do] not believe the case has a value near the MLR request, but given the climate the concussions and lack of medical knowledge, juries could be all over the map.  I would not be shocked by a verdict of $150K-$5M.

(Id.).

[26]

As a result of the concerns regarding Feeley's misconduct, Wachusett changed its strategy with respect to the Underlying Action.  Thus, as Hamel Marcin had suggested in the "Resolution Strategy" section of its August 8, 2018 liability and damages analysis, Wachusett advised Hache and the trial court that it intended to stipulate to liability at the trial of the Underlying Action while continuing to dispute "the nature, extent and severity of the Plaintiff's claimed injuries as well as the causal relationship of the Plaintiff's injuries to the [March 8, 2015] accident." (See AmWINS SOF ¶ 43; AmWINS Ex. R).  In other words, Wachusett planned to concede liability and proceed to trial on Hache's damages claims.  The record demonstrates that the goal of this strategy was to keep evidence of Feeley's misconduct out of the case and focus on the dispute regarding potential damages.  (See Pl. Ex. 20 at CM/ECF Page 7 of 7).

In early November 2018, Karen Skiba, who managed the MountainGuard Program for AIG, approved the MLR to increase the reserve to $500,000 on Hache's claim.  (Pl. Ex. 1 at 7-8, 47).  She also granted AmWINS settlement authority up to that amount.  (Id. at 55-56).  According to Ms. Skiba, she believed the settlement authority and increased reserve amount fairly reflected the value of Hache's claim at that time.  (Id. at 56).  Thus, although the undisputed facts establish that a "reserve" is not equivalent to "settlement authority," it is undisputed that at this point in the Underlying Action, AmWINS's settlement authority was equivalent to the indemnity reserve on the claim.  (See AmWINS Ex. CC at 56).

On November 6, 2018, Wachusett submitted an Offer of Judgment in which it offered to settle all claims in the Underlying Action for $425,000.  (AmWINS Ex. S).  Hache rejected the offer.  (See AmWINS SOF ¶ 45).  During a subsequent conversation between the parties' counsel, Hache's counsel indicated that his client would be willing to reduce his settlement

demand from $9 million to $5 million.  (AmWINS Ex. C at 4-5).  However, AmWINS viewed this proposal as "an untenable area [for any] real negotiations."  (Id. at 5).  Shortly thereafter, the trial court denied Wachusett's motion to stipulate to liability and proceed to trial on damages only.  (Id. at 3).  The trial court also rescheduled the trial to July 8, 2019.  (Id. at 3).

### Events Following Hache's Rejection of AmWINS' $425,000 Settlement Offer

On November 23, 2018, Wachusett's lead defense counsel at Hamel Marcin, Richard Shea, sent an email to AmWINS and AIG in which he addressed his concerns about the Underlying Action in light of the trial court's denial of Wachusett's proposed stipulation and the "bad optics" caused by Feeley's misconduct.  (See PF ¶¶ 38-40; Pl. Ex. 7 at CM/ECF Page 3 of 27).  Therein, Attorney Shea expressed deep concerns about the potential impact of Mr. Feeley's conduct on the jury's verdict, which he described in relevant part as follows:

> If the jury believes that there was a cover-up, it may well disregard as not believable our damages experts ..... painting the entire defense presentation as a sham.  If so, the verdict range will clearly be in the low to mid-seven figures given the loss of economic damages alone being in the range of $1.0M to $2.2M.  Aside from admitting that "mistakes were made", it is really hard to credibly explain to the jury an alternative, rational[ ] explanation as to why Corey Feeley fabricated training records and then allegedly lied about it by spinning a tale at his deposition.

(Pl. Ex. 7 at CM/ECF Page 3 of 27).

Attorney Shea went on to express his opinion that "it would take negotiations in the 'multi-million' dollar range to settle this case" in light of Hache's current settlement demand of $5 million, and that he believed the case "would presently require somewhere in the range of $1.5M to $2.5M to settle."  (Id.).  He further advised AmWINS and AIG in relevant part as follows:

> I do not see the case getting better during trial.  Again, we have excellent damages' (sic) experts but I am concerned that they will be dismissed as being painted with

[28]

the same negative broad brush attendant to the false and fabricated testimony by Wachusett's lift supervisor.  The jury may well negatively view our entire presentation because they are so inflamed by the bad acts that occurred in this case.

If so, I would not be surprised if the jury "punishes" Wachusett and returns a verdict in the low to mid-seven figures ([i].e. $3M to $5M+) ....

(Id.).  While Attorney Shea acknowledged that "Wachusett runs an excellent operation[,]" he warned that Feeley's misconduct was "binding on the mountain" and would be admitted as evidence at trial.  (Id.).  Notably, however, Attorney Shea did not indicate that there had been any changes in his assessment of Hache's damages or any reason to abandon Wachusett's challenge to Hache's claims regarding his cognitive injuries.  (See id.).  In fact, Attorney Shea's November 23, 2018 email to AmWINS and AIG included a copy of a November 22, 2018 email that he had sent to "monitoring counsel" at Sloane and Walsh, LLP.  (Id. at CM/ECF Pages 3-5 of 27).  Therein, Attorney Shea confirmed the parties' opposing views regarding the nature and extent of Alex's injuries.  (See id. at CM/ECF Page 5 of 27).  Mr. Kilcline described defense counsel's new assessment of the settlement value of the Underlying Action as a "flip-flop" and a dramatic change from Hamel Marcin's prior assessment.  (Pl. Ex. 18 at 86-87).

Several days later, Attorney Shea informed AmWINS and AIG that Hache's counsel had asked whether there was any interest in reopening dialogue regarding settlement.  (Pl. Ex. 7 at CM/ECF Page 1 of 27).  It is undisputed that no settlement discussions occurred at that time. (See PF ¶ 44; AR ¶ 44; DR ¶ 44).  However, on December 14, 2018, Charles Creamer, the claims adjuster from AIG who was responsible for handling the Excess Policy, reported that "[p]rimary will reserve [their] 1M" and that he was "waiting for our excess counsel to review the matter

and provide input" so he could "discuss reserving with mgr and possibility of mediation." (Pl. Ex. 20 at CM/ECF Page 6 of 7).

### AIG's Participation in Matters Pertaining to Hache's Claim

In mid-January 2019, AmWINS provided AIG with a second draft MLR requesting to increase the indemnity reserve on the Primary Policy up to the $1 million limit. (AmWINS SOF ¶ 51; PR AmWINS SOF ¶ 51; AmWINS Ex. U at CM/ECF Page 279 of 373). Initially, AIG rejected the request. (PF ¶ 49; AR ¶ 49; DR ¶ 49). As Mr. Kilcline stated in an email to Mr. Creamer on January 17, 2019, "I just had to reject the $1M MLR - on grounds that how can we justify reserving such an amount if meds are $51K. Requested further analysis on compensatory and potential 93a Damages." (Pl. Ex. 22 at CM/ECF Page 1 of 4). Mr. Kilcline later explained that at the time he wrote that email, AIG's plan was to try to settle the Underlying Action at mediation within the primary layer with a contribution from Wachusett and with no contribution from the excess carrier. (PF ¶ 48).

On about February 5, 2019, AIG's Ms. Skiba approved AmWINS' request to increase the reserve on the Primary Policy to $1 million. (PF ¶ 49; AR ¶ 49; DR ¶ 49). The approved MLR, on which Ms. Skiba based her decision, provided in relevant part as follows:

> Liability is likely ... Defense will argue that it did not breach any duty of care to Mr. Hache and the lifts were operated in a reasonabl[e] manner. However, it was confirmed during discovery that Lift Supervisor Corey Feel[e]y falsified training records for other employees involved with this incident after reporting the matter to the MA Tramway board. Further, based upon the representation from Mr. Feel[e]y, the Insured GM, Jeff Crowley, similarly testified inconsistently as to employee training compliance. Based upon this, we anticipate that plaintiff will amend the complaint to include a M.G.L. Ch. 93A violation claim, which exposes the insured to double or treble damages plus the award of attorney's fees and costs. These adverse developments have greatly affected the value of the claim, and counsel estimates the verdict range will likely be in the mid-seven figures once the jury learns about the insured's dishonest conduct.

(Pl. Ex. 23 at CM/ECF Page 1 of 2).  Ms. Skiba believed that this information affected the value

of the claim for purposes of increasing the reserve.  (See Pl. Ex. 1 at 58-59).  However, as

described below in this court's analysis, an insurer's increase in its reserve does not mean that

both liability and damages have become reasonably clear.

After learning about Feeley's misconduct in connection with the Underlying Action, AIG

retained counsel and issued a reservation of rights letter to Wachusett in which it informed the

insured that it was reserving its "right to demand that Wachusett bear responsibility for any

additional damages that may result in this case or any increase in the necessary cost of

settlement" that might occur as a result of Feeley's fabrication of the training records and his

false statements during his deposition.  (AIG Ex. 7 at 2-3).  In the letter, AIG stated in significant

part that

> [w]hile we cannot predict at this time whether evidence of this sort may influence
> the jury's evaluation of liability and/or damages in this case, it has clearly affected
> plaintiff's counsel's evaluation of the settlement value of this case.  As mentioned
> earlier, counsel has demanded $9 million to settle and has since given no
> indication that he will settle for less than several million dollars.  Owing to these
> developments, defense counsel is recommending that we consider settling this
> case for somewhere between $1,500,000 and $2 million despite the fact that they
> would otherwise assess the value of the case as being between $450,000 -
> $600,000.

(Id. at 3).

In or about February or March 2019, Mr. Kilcline's responsibilities for the

MountainGuard Program were transferred to an "excess primary group" at AIG that handled

matters for which AIG faced potential exposure under both a primary policy and an excess

policy.  (Pl. Ex. 18 at 45-46).  On March 1, 2019, AIG approved a request for a $2 million reserve

on the Excess Policy.  (PF ¶ 56).  In the approved MLR for the excess policy reserve, Charles

Creamer, a Complex Director in AIG's Excess Casualty Unit with responsibility for handling

Hache's claim on behalf of National Union, had written the following regarding Hache's

"Injuries/Damages":

> Alexander Hache ... sustained a nondisplaced pelvic [fracture], negative CT of head, compression fractures of T11, 12 & L2 & 3 & concussion.  He had some follow up visits for his concussion & [physical therapy], by 2/8/26 was fully active.  Therapy from 8/2015 to 11/2015.  His next treatment was in 6/2017 for cognitive therapy.  Claims persistent deficits & impairments of attention working memory, new learning, & executive functioning.  He is on the track team and during the 2017-2018 school year he got A's & B's.  Our medical experts opine he has fully recovered from his physical injuries & does not have a TBI.  [Plaintiff's] experts opine he still has pain from his physical injuries & his brain injury will continue to have an impact on his education & vocational performance.  Meds $50K.  Claims $1.4M to $2M in future lost wages.

(Pl. Ex. 27 at CM/ECF Page 1 of 2; see also AIG SOF ¶ 9).

In early April 2019, Mr. Creamer urged West to arrange for another mediation.  (See Pl.

Ex. 22 at CM/ECF Page 3 of 4).  The parties' counsel discussed the possibility of a second

mediation, and on April 25, 2019, West informed Mr. Creamer that Hache had not yet agreed to

participate.  (AmWINS SOF ¶ 55; Pl. Ex. 22 at CM/ECF Page 4 of 4).  West also told Mr. Creamer

that given the plaintiff's "desire to 'talk with the excess adjuster'," Hache "clearly will not settle

for anything under 7 figures."  (Pl. Ex. 22 at CM/ECF Page 4 of 4).  Furthermore, West informed

Mr. Creamer that "I still do not feel this case has any value in excess of the primary policy and

should go to a jury verdict."  (Id.).

By early May 2019, Ms. Skiba's responsibility for Hache's claim had been transferred to

Tim Ray, an Assistant Vice President in AIG's Excess Casualty Group and Mr. Creamer's manager

with respect to Hache's claim.  (PF ¶ 60).  Mr. Ray had settlement authority for both the

Primary Policy and the Excess Policy.  (Id.).  On May 6, 2019, Attorney Sweet notified West and

Mr. Creamer that Hache's counsel had said his client would only agree to return to mediation if Wachusett made a "significant" offer beforehand.  (PF ¶ 62; see also AmWINS SOF ¶ 55).  Attorney Sweet also noted that while "the objective value of the case is not necessarily in the 7-figures[,] ... the negative liability issues that have been detailed at length could create a situation where a jury seeks to 'punish' Wachusett with a 7-figure verdict."  (Pl. Ex. 7 at CM/ECF Page 21 of 27).  Accordingly, he informed West and Mr. Creamer that "[o]ur thought remains that a settlement in the 1.5 to 2.5 range could resolve the case."  (Id.).

The parties continued to discuss the possibility of a second mediation.  On May 10, 2019, Mr. Creamer instructed Attorney Sweet to inform Hache's counsel that the adjuster for the Excess Policy would participate in the mediation.  (PF ¶ 65).  On May 16, 2019, Attorney Sweet informed Mr. Creamer and West that he had conveyed the message but that Hache's counsel had reiterated that his clients would not attend unless Wachusett made "a 'significant' offer" prior to the mediation.  (Id.).  In response, Mr. Creamer instructed Attorney Sweet to "[t]ell them we have offered $450K, they are at 5M, the excess layer adjuster will be at mediation and that should tell them we are talking about numbers in the excess layer[.]"  (Id.).  Then on May 13, 2019, Attorney Sweet informed Mr. Creamer that he had spoken again with Hache's counsel "and it is apparent that a resumed mediation of the case will simply not be productive."  (Pl. Ex. 7 at CM/ECF Page 22 of 27).  Attorney Sweet explained that Hache's counsel was "moving away from the reduced demand of $5 million" and had "returned to the previous demand of $9 million made at the first mediation."  (Id.).  He further explained that this was based on the assertion that Alex's injuries "have allegedly 'gotten worse'," although defense counsel had not seen anything to substantiate that claim.  (Id.).  Attorney Sweet

advised Mr. Creamer that Hache's expectations were unreasonable and that it was probably

best to focus on trial preparation.  (Id.).  Mr. Creamer responded by asking when the last day

was to file another offer of judgment before trial.  (Id.).

<u>Events Surrounding Wachusett's July 1, 2019 Settlement Offer</u>

In May 2019, Hache provided defense counsel with additional medical records regarding

orthopedic and cognitive injuries that Alex allegedly suffered as a result of his ski accident.

(AmWINS SOF ¶ 57).  He also produced new expert reports from Alexandra Stillman M.D., the

Director of the Concussion, Traumatic Brain Injury and Neurorehabilitation Clinic at Beth Israel

Deaconess Medical Center in Boston, Massachusetts, and George P. Whitelaw, M.D., an

orthopedic specialist with Orthopedic Trauma, P.C. in Milton, Massachusetts.  (Id. ¶¶ 58-60;

AmWINS Exs. V & W).  In her report, Dr. Stillman opined that Hache was continuing to suffer

from "cognitive issues/difficulties" relating to the concussion he suffered in his fall from the

chairlift, "including word-finding issues, work recall issues, forgetting what he learns, trouble

with reading, trouble with multi-tasking, and trouble with multi-step problems[,]" and that "he

likely will have life-long cognitive issues" as a result of his accident.   (AmWINS Ex. V at CM/ECF

Page 286 of 373).  She also opined that Hache was suffering from ongoing back pain "directly

related to the multiple fractures he sustained in the fall[,]" and that he "likely will have life-long

back pain" as a result of the accident.  (Id.).  Dr. Whitelaw stated in his report that Alex was

suffering from "back pain status post compression fractures, piriformis syndrome, illotibial band

syndrome of the right leg, de-conditioned low back, and right leg pain."  (AmWINS Ex. W at

CM/ECF Page 291 of 373).  He further opined that these conditions "are all directly causally

related" to Alex's accident on March 8, 2015, and that as a result of his fall, Alex "will likely

continue to experience physical problems and challenges of a similar nature as to those he has experienced since the fall ... for the foreseeable future." (Id. at CM/ECF Page 292 of 373).

In response to the plaintiff's newly retained experts, Wachusett retained Matthew Werger, M.D., an orthopedic specialist at St. Elizabeth's Medical Center in Brighton, Massachusetts, to evaluate Alex's claims of ongoing orthopedic symptoms. (AmWINS SOF ¶ 60; see also AmWINS Ex. X). As described in a written report of his opinions, Dr. Werger determined that the orthopedic injuries stemming from Alex's fall had caused Alex to experience low and mid-back pain, as well as pain in his right hip. (AmWINS Ex. X at CM/ECF Page 297 of 373). However, Dr. Werger also determined that Alex's pain had "improved with each course of physical therapy[,]" and opined that Alex's "reported physical problems and challenges can greatly be improved and mitigated by lifestyle modifications and a strong commitment to proper physical fitness" in accordance with recommendations that previously had been made by his physical therapists. (Id.). Accordingly, Dr. Werger concluded that Alex "may have mild chronic low back pain from his injury on 3/8/15, but his improvements with physical therapy alone suggest that he should not have a permanent functional disability with regards to his hip or back that limits his future ability to participate in sports or fitness." (Id. at CM/ECF Page 298 of 373).

According to Mr. Creamer, the newly produced medical information regarding Alex's symptoms changed his evaluation of the plaintiff's claim. (Pl. Ex. 29 at 89). As Mr. Creamer testified during his deposition in this case:

> he's claiming damages we didn't know about, continuing damages. As we sat there in May, he had $51,000 in medicals. He had broken some bones. He had a concussion. He appears to have recovered. He was doing well in school. He was running track. That was what we knew at that point in time. Then a month or so

[35]

> before trial we get in psychological records that say he's having cognitive difficulties and trouble in school and that his back has been bothering him. Certainly that impacts your valuation of the damages.

(Id. at 90).  Mr. Creamer further testified that following an analysis of Hache's new medical evidence, and in light of the uncertainty as to how the case was going to be tried, he believed that "the million dollar policy should be offered."  (See id. at 91-92).  Consequently, he spoke to Mr. Ray, who agreed that "it would be a good idea to offer the million dollars[,]" and reached out to West to discuss whether he would be willing to offer the limit of the Primary Policy.  (Id. at 98).  It is undisputed that on June 27, 2019, West agreed to make the offer.  (PF ¶ 70; AR ¶ 70; DR ¶ 70).

On July 1, 2019, Wachusett's defense counsel, acting at AIG's direction, presented a $1 million structured settlement offer to Hache's counsel while the parties were in court awaiting a pretrial conference. (PF ¶ 71; AmWINS SOF ¶ 63).  Hache did not accept the offer.  (AmWINS SOF ¶ 64).  It is undisputed that, at the time of the proposed settlement, the plaintiff's formal demand remained $9 million.  (Pl. Ex 7 at CM/ECF Page 27 of 27).

### Outcome of the Underlying Action and Initiation of the Instant Action

In the meantime, Wachusett's counsel had filed a motion in limine to limit the evidence and argument at trial to the nature and extent of the plaintiff's claimed damages and to preclude all evidence and argument of fault, including any evidence regarding the falsified training records.  (AmWINS SOF ¶ 62).  On July 2, 2019, the trial court allowed the motion to confine the trial to the issue of damages but reserved its ruling on whether the plaintiff could present certain evidence at trial.  (AmWINS Ex. Z at 2).  In its order, the court noted that it was

unlikely to admit evidence regarding the spoliation and/or falsification of training documents in light of Wachusett's concession of liability and the lack of a punitive damages claim.  (Id.).

A trial took place on the issue of damages.  (Pl. Ex. 11 at CM/ECF Page 2 of 5).  According to Hache's counsel, the plaintiff presented testimony from his expert neurologist, along with Dr. McGrath's two neuropsychological evaluations, to show that Alex suffered permanent brain damage, but Wachusett presented no testimony from a neurologist or neuropsychologist to rebut that evidence.  (Raphaelson Aff. ¶ 11).  The parties have presented no facts explaining Wachusett's decision.  Nor have they presented a full description of the trial.  In any event, it is undisputed that on July 18, 2019, the jury returned a verdict of $3,275,000 in Hache's favor, which consisted of $3 million for pain and suffering and $275,000 for Alex's lost earning capacity and resulted in a judgment of $4.56 million.  (AmWINS Ex. AA; PF ¶ 72; AmWINS SOF ¶ 67).  On or about September 6, 2019, Granite State issued a $1,417,245 payment to Hache. (AmWINS SOF ¶ 68).  The payment reflected the full amount of coverage available under the Primary Policy, as well as a proportionate share of the prejudgment and post-judgment interest that Granite State owed under the Supplementary Payment provisions of its Policy.  (Id.). National Union paid the remaining portion of the judgment.  (Id.).

On October 4, 2019 and November 27, 2019, Hache's counsel sent Granite State, AIG and AmWINS nearly identical demand letters pursuant to Chapter 93A.  (Id. ¶¶ 69-70).  Therein, plaintiff's counsel asserted in relevant part that the defendants violated Chapters 176D and 93A by failing "to pay Alex's claim without conducting a reasonable investigation based on all available evidence and failed to effectuate a prompt, fair and equitable settlement of Alex's claim after liability became reasonably clear[,]" that "[t]hese violations were ongoing before, at,

and after the mediation, and through when you tendered the coverage limit shortly before the July 2019 trial[,]" and that the defendants' actions "were willful and knowing."  (See Docket No. 114-1 at 8, 11).  He also demanded that each of the defendants make a reasonable offer of settlement to resolve his Chapter 93A claims.  (See id.).  In a letter dated November 4, 2019, counsel for Granite State and AIG responded to Hache's demand and tendered a settlement offer in the amount of $113,389.14 pursuant to the so-called "safe harbor" provisions of Chapter 93A.  (Id. at 9-10).  By letter dated December 23, 2019, AmWINS' counsel provided a response to Hache's demand letter in which he relied on the settlement proposal by counsel for Granite State and AIG to fully compensate Hache for any damages he may have suffered as a result of the defendants' unfair settlement practices.  (See id. at 13-14).  Hache did not respond to the defendants' responses to his demand letters, and there is no indication that the parties engaged in further communications regarding settlement.[10]  (Id. at 14).  On February 18, 2020, Hache filed the instant lawsuit against each of the insurers.  (Id.).

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.  STANDARD OF REVIEW

As described above, this matter is before the court on the defendants' motions for summary judgment and on Hache's cross-motions for summary judgment against AmWINS and AIG.  "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F.

---

[10] The court has ruled that each of the defendants is entitled to protection under the safe harbor provision of Chapter 93A and that Hache's potential recovery in this action should be capped at $113,389.14.  (See Docket No. 114).

Supp. 2d 274, 275 (D. Mass. 2011) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991)) (additional citations omitted).  Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party[.]'"  <u>Taite v. Bridgewater State Univ., Bd. of Trs.</u>, 999 F.3d 86, 93 (1st Cir. 2021) (quoting <u>Ellis v. Fid. Mgmt. Tr. Co.</u>, 883 F.3d 1, 7 (1st Cir. 2018)).  "[A] fact is 'material' if it 'has the potential of affecting the outcome of the case[.]'"  <u>Id.</u> (quoting <u>Pérez-Cordero v. Wal-Mart P.R., Inc.</u>, 656 F.3d 19, 25 (1st Cir. 2011)).

When a properly supported motion for summary judgment is presented, the non-moving party can avoid summary judgment only by providing properly supported evidence of a genuine dispute about material facts.  <u>See</u> <u>Theriault v. Genesis HealthCare LLC</u>, 890 F.3d 342, 348 (1st Cir. 2018).  Accordingly, "the nonmoving party must . . . 'set forth specific facts showing that there is a genuine issue for trial[.]'"  <u>Carrozza v. CVS Pharmacy, Inc.</u>, 992 F.3d 44, 56-57 (1st Cir. 2021) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  In evaluating a motion for summary judgment, the Court must review the record "in a light most favorable to the non-moving party[.]"  <u>Lima v. City of E. Providence</u>, 17 F.4th 202, 206 (1st Cir. 2021).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Popular Auto, Inc. v. Reyes-Colon (In re Reyes-Colon)</u>, 922 F.3d 13, 20 (1st Cir. 2019) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

### IV.  ANALYSIS -- CROSS-MOTIONS FOR SUMMARY JUDGMENT ON HACHE'S CLAIM AGAINST AMWINS

AmWINS and Hache have each moved for summary judgment on Count II of the First Amended Complaint.  Therein, Hache alleges that AmWINS' actions in connection with the Underlying Action "violated G.L. c. 176D, §§ 3(9)(d) and (f) and constitute unfair or deceptive acts or practices under G.L. c. 93A."  (First Amended Complaint ("FAC") (Docket No. 29) ¶ 46). Hache further alleges that AmWINS "engaged in these unfair or deceptive acts or practices willfully and with knowledge that it was violating Alex's rights under c. 176D and c. 93A."  (Id.). For the reasons that follow, this court finds that the material facts regarding AmWINS' conduct are not in dispute and that AmWINS is entitled to judgment as a matter of law on Count II.

#### A.  General Legal Principles

"General Laws c. 93A § 2(a) states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.'  General Laws c. 176D, § 3, in turn, prohibits 'unfair or deceptive acts or practices in the business of insurance[.]'"  Bobick v. U.S. Fid. & Guar. Co., 439 Mass. 652, 658, 790 N.E.2d

[40]

653, 658 (2003).  Because Chapter 93A incorporates Chapter 176D, an insurer who violates the latter statute "by definition, has violated the prohibition in [Chapter] 93A § 2, against the commission of unfair or deceptive acts or practices."  Id. at 659, 790 N.E.2d at 658 (quoting Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 564, 750 N.E. 2d 943, 950 (2001)).  Where the insurer's violation of Chapter 175D is found to be "wilful or knowing (or ... both)," the plaintiff will be entitled to "double or treble damages."  Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 495, 961 N.E.2d 1067, 1075 (2012).

In the instant case, Hache claims that AmWINS violated Chapter 176D §§ 3(9)(d) and (f). The first provision "prohibits an insurer from refusing to pay claims without conducting a 'reasonable investigation based upon all available information.'"  Bohn v. Vermont Mut. Ins. Co., 922 F. Supp. 2d 138, 149 (D. Mass. 2013) (quoting Mass. Gen. Laws ch. 176D, § 3(9)(d)). The latter provision prohibits an insurer from "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]"  Mass. Gen. Laws ch. 176D, § 3(9)(f).  Although the question whether an insurer has engaged in unfair claim settlement practices under Chapter 176D is ordinarily determined by a finder of fact, the Massachusetts Supreme Judicial Court ("SJC") has determined that there is no reason why the question "may not be settled in favor of an insurer on a motion [for summary judgment], in circumstances when undisputed material facts in the record demonstrate that the plaintiff has 'no reasonable expectation of proving an essential element' of his case.'"  Bobick, 439 Mass. at 659, 790 N.E.2d at 658 (quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716, 575 N.E.2d 734, 740 (1991)).  This court finds that this case presents such circumstances.

B.  **Reasonableness of AmWINS' Investigation**

Both AmWINS and Hache have moved for summary judgment with respect to Hache's

claim that AmWINS engaged in unfair claim settlement practices by failing to conduct a

reasonable investigation.  While Hache argues broadly that AmWINS disregarded its duty to

conduct a reasonable investigation of Alex's claims prior to the parties' April 3, 2018 mediation,

AmWINS contends that it is entitled to summary judgment on this claim because Hache has

failed to present any evidence to show that its investigation was inadequate.  (Pl. Opp. to

AmWINS at 13; AmWINS' Mem. at 5).[11]  This court finds that AmWINS is entitled to summary

judgment on this basis.

The undisputed facts establish that AmWINS opened an investigation into Hache's claim

within one month following Alex's fall from the Wachusett chairlift.  (AmWINS SOF ¶ 3).  They

also demonstrate that West continued to investigate Hache's claims and monitor the factual

and legal developments throughout the course of the Underlying Action.  (See AmWINS Ex. C;

Pl. Ex. 30).  In particular, the record demonstrates that West maintained communications with

Wachusett's counsel regarding developments in the litigation and assessments of potential

liability, reviewed information concerning the plaintiff's alleged injuries, performed his own

evaluations regarding the value of the case, and monitored events during the trial.  (See, e.g.,

Pl. Exs. 7, 12-13, 14 at 111-12, 15 & 30).  Additionally, AmWINS has presented an unrebutted

report from its expert, Stephen D. Johnson, in which Mr. Johnson opined that AmWINS'

---

[11] "Pl. Opp. to AmWINS" refers to the Plaintiff's Opposition to Defendant AmWINS Program
Underwriter's Motion for Summary Judgment; and Plaintiff's Cross-Motion for Summary Judgment on
Count II of the First Amended Complaint (Docket No. 163).  "AmWINS' Mem." refers to AmWINS
Program Underwriter Inc.'s Memorandum in Support of Motion for Summary Judgment (Docket No.
158).

investigation of Hache's claim complied with industry standards.  (AmWINS Supp. Ex. B at 26).

These facts compel the conclusion that AmWINS conducted a reasonable investigation.  See

Cytosol Labs, Inc. v. Fed. Ins. Co., 536 F. Supp. 2d 80, 95 (D. Mass. 2008) (listing proactive steps

taken by insurer to investigate plaintiff's claim as evidence of insurer's reasonable investigation

and ruling that plaintiff's Chapter 93A claim was "insufficient as a matter of law" where plaintiff

failed to show "that a reasonable insurer would have conducted any additional investigation.").

In connection with his cross-motion for summary judgment on this issue, Hache asserts

that AmWINS "disregarded its duty to conduct a reasonable investigation of Alex's claim based

on available information." (Pl. Opp. to AmWINS at 15).  For the most part, however, Hache's

arguments in support of this assertion have nothing to do with AmWINS' investigation.  For

example, but without limitation, Hache argues that "[b]efore the mediation, West deliberately

disregarded Wachusett's counsel's advice on a fair settlement range for the case ($450,000 to

$600,000) and attended the mediation with only the limit of his authority of $75,000." (Id.).

While this argument illustrates Hache's disagreement with West's assessment regarding the

value of Hache's claim, it provides no support for a finding that AmWINS failed to conduct a

reasonable investigation.  Similarly, but again without limitation, Hache argues that "[b]efore

the mediation, West knowingly failed to notify his boss, Richard Donahue, about the claim in

violation of [AmWINS'] protocol to bring to Donahue's attention claims that could exceed

West's authority of $75,000, and he knowingly failed to notify AIG Claims in violation of the

[CSA]." (Id.).  Again, this argument reveals nothing about AmWINS' investigation and provides

no support for Hache's claim.

To the extent Hache takes issue with specific aspects of AmWINS' investigation, his arguments are unconvincing.  Thus, Hache argues that

> [b]efore the mediation, West formed the conclusion that Alex made a "good recovery" from his orthopedic injuries, and didn't investigate Alex's sworn testimony in January 2017 that he continued to suffer pain from his five vertebral fractures and pelvis fracture, or his mother's sworn testimony in May 2017 that he continued to experience pain in his legs and back, sometimes had difficulty bending over, had trouble walking and running and sometimes could not run, and couldn't play contact sports or ski.

(Id. at 16).  As Hache indicates in the very next paragraph of his argument, however, West was fully aware of the Haches' allegations but believed "Mrs. Hache was significantly exaggerating the value of the claim[.]"  (Id.).  Additionally, the plaintiff's own exhibits demonstrate that West was aware of both Alex's and his mother's deposition testimony at the time the mediation took place in April 2018.  (See Pl. Ex. 12 at 10-11 (describing plaintiffs' deposition testimony in letter from defense counsel to West dated October 30, 2017); Pl. Ex. 30 at CM/ECF Pages 65, 68 & 75 of 85 (containing West's notes from 2017 regarding the Haches' depositions)).  Hache has not identified anything specific that West should have done but failed to do to after considering that testimony.

Hache also argues that "[b]efore the mediation, West did not investigate the likely impact of the fabricated training record and the 30(b)(6) perjury on the credibility of Wachusett's defense and likely verdict[.]"  (Pl. Opp. to AmWINS at 17).  Again, however, the plaintiff's own exhibits indicate otherwise.  In its initial liability and damages analysis, which was sent to West on or about October 30, 2017, Hamel Marcin alerted AmWINS to the "potentially damaging credibility issues that Wachusett will face at trial" as a result of Feeley's misconduct, and it took that evidence into account in recommending a settlement range for the case.  (Pl.

Ex. 12 at 14-15).  Consequently, Hache has failed to "specify any concrete investigatory steps that [AmWINS] did not take or lines of inquiry that went unpursued[.]"  Scott v. Vt. Mut. Ins. Co., Civil Action No. 07-12081-DPW, 2011 WL 4436984, at *13 (D. Mass. Sept. 22, 2011). Therefore, AmWINS is entitled to summary judgment with respect to this claim.

    **C.   Whether Wachusett's Liability Was Reasonably Clear**

       Both AmWINS and Hache have also moved for summary judgment on Hache's claim that AmWINS engaged in unfair claim settlement practices by failing to effectuate a prompt, fair and equitable settlement of a claim in which liability has become reasonably clear.  See Mass. Gen. Laws ch. 176D, § 3(9)(f).  AmWINS argues that it is entitled to judgment as a matter of law on this issue because the record establishes that liability and damages against Wachusett were never reasonably clear.  (AmWINS' Mem. at 8-16).  Specifically, AmWINS argues that the parties maintained a "'legitimate difference of opinion' as to the nature, extent, and severity of Hache's alleged cognitive impairments and ongoing orthopedic difficulties from the Accident." (Id. at 10-11).  Therefore, it contends that Hache cannot establish that it ever had an obligation to effectuate a settlement.  (See id. at 5).  Hache asserts that AmWINS misinterprets Massachusetts law.  (See Pl. Opp. to AmWINS at 4-5).  He argues that under the controlling authority, an insurer has an obligation to make a prompt and reasonable settlement offer for the undisputed injuries that the plaintiff has suffered, even if a dispute remains regarding the plaintiff's claim of additional harm.  (See id. at 7).  While Hache posits that "[d]isputes over the extent of harm caused by personal injuries may impact what constitutes a 'reasonable offer'" of settlement under Chapter 176D, he maintains that such disputes "do[ ] not relieve an insurer from making the offer altogether.  Where all of the elements of a negligence claim are

undisputed -- negligence and causation leading to injury -- an insurer has a duty to make prompt and reasonable offers of settlement for the undisputed injury." (Id. at 8).  Because he contends that Wachusett's fault for Alex's physical harm was undisputed, he claims that he is entitled to summary judgment on this issue.  (See id. at 7).   For the reasons that follow, this court finds that AmWINS' reading of the applicable authority is correct.  Furthermore, because there can be no genuine question that that the nature and extent of Hache's injuries was vigorously contested during all times relevant to Hache's claim against AmWINS, the defendant is entitled to judgment as a matter of law on this claim.

### Relevant Authority

Under Massachusetts law, "[a]n insurer's duty to settle does not arise until 'liablility has become reasonably clear.'" Scott, 2011 WL 4436984, at *8 (quoting Mass. Gen. Laws ch. 176D, § 3(9)(f)).  "Liability" for purposes of this requirement "encompasses both fault and damages." River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 38 (1st Cir. 2019) (quoting Clegg v. Butler, 424 Mass. 413, 421, 676 N.E.2d 1134, 1140 (1997)).  Therefore, "liability cannot be considered 'reasonably clear' if either fault or damages are still contested."  Clegg, 424 Mass. at 418, 676 N.E.2d at 1138.  See also Bobick, 439 Mass. at 659-60, 790 N.E.2d at 659 (ruling that the insurer "[is] not required to put a fair and reasonable offer on the table until liability and damages [are] apparent" or if "there exist[s] a legitimate difference of opinion as to the extent of . . . liability.").  "[E]ven if an insurer has concluded that fault has attached, doubt as to either damages or the proportionate share of damages may prevent liability from being reasonably clear."  Scott, 2011 WL 4436984, at *8.  In the instant case, "[t]he relevant inquiry is whether [AmWINS] reasonably believed that its insured's liability with respect to damages was not

clear." <u>O'Leary-Alison v. Metro. Prop. & Cas. Ins. Co.</u>, 52 Mass. App. Ct. 214, 217, 752 N.E.2d 795, 798 (2001).

Hache's assertion that AmWINS was obligated to effectuate a settlement for the undisputed portion of Hache's injuries is undermined by the SJC's discussion of Chapter 176D § 3(9)(f) in <u>Lazaris v. Metro. Prop. & Cas. Inc. Co.</u>, 428 Mass. 502, 703 N.E.2d 205 (1998).  In that case, the SJC recognized the "difference between making a payment on a claim and settling that claim[,]" and it emphasized the fact that "Section 3(9)(*f*) speaks of effectuating 'settlements of claims,' not the payment of claims." <u>Lazaris</u>, 428 Mass. at 504-05, 703 N.E.2d at 206-07.  The court also concluded that "a claim is settled within the meaning of § 3(9)(*f*) only when it is fully disposed of, which means that the claimant has released all claims against the insured." <u>Id.</u> at 504, 703 N.E.2d at 206.  Therefore, "to pay without a release is not a settlement." <u>Id.</u> at 506, 703 N.E.2d at 207.  Hache's contention that insurers have an obligation to settle claims partially, where their full liability remains unclear, is at directly at odds with the reasoning in <u>Lazaris</u>.  Acccordingly, "if damages are contested in good faith, then liability on the claim is not reasonably clear" and the insurer has no duty to effectuate a settlement.  <u>Ingalls v. Minnesota Lawyers Mut. Ins. Co.</u>, Civil Action No. 12-11057-GAO, 2013 WL 3943537, at *1 (D. Mass. July 29, 2013).

### Whether Wachusett's Liability and Damages Were Clear

In the instant case, Hache claims that AmWINS' duty to effectuate a settlement arose at the time of the April 2018 mediation and continued throughout the six months following the mediation, after which time AmWINS offered to settle the Underlying Action for $425,000.  (See Pl. Reply to AmWINS at 11 ("the specific points in time in question in this motion are the April

2018 mediation and during the six months thereafter.")).[12]  Notably, Hache appears to concede that damages relating to Alex's alleged cognitive injuries were disputed and unclear throughout this time period.  (See Pl. Opp. to AmWINS at 8-9 (arguing that AmWINS "had a duty to make reasonable offers of settlement at the parties' mediation in April 2018, three years after Alex fell, and promptly thereafter, for the five fractured vertebrae, the fractured pelvis, the concussion, the emotional pain and suffering associated with hanging from the chair lift, the physical therapy, the medical expenses associated with Alex's care and treatment totaled approximately $50,000, and Alex's pain and suffering associated with the orthopedic injuries[,]" but failing to address Alex's claim of permanent brain damage)).  In any event, it is plain from the record that Wachusett's liability, and in particular the nature and extent of Alex's injuries, were highly contested throughout that time period and that AmWINS reasonably believed that Wachusett's liability with respect to damages was far from clear.

"The question whether liability is reasonably clear depends on 'whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff.'"  Scott, 2011 WL 4436984, at *8 (quoting Nyer v. Winterthur Int'l, 290 F.3d 456, 461 (1st Cir. 2002)) (additional quotations and citation omitted).  See also O'Leary-Alison, 52 Mass. App. Ct. at 217, 752 N.E.2d at 798 (same).  In instances where fault is not at issue, "the inquiry is limited to damages."  O'Leary-Alison, 52 Mass. App. Ct. at 217, 752 N.E.2d at 798.  "This is an objective standard, which takes into account the totality of the circumstances."  Scott, 2011 WL 4436984, at *8 (internal citation

---

[12] "Pl. Reply to AmWINS" refers to the Plaintiff's Reply to AmWIN Program Underwriters, Inc.'s Opposition to Plaintiff's Cross-Motion for Summary Judgment on Count II of the First Amended Complaint (Docket No. 194).

omitted).  Relevant evidence may include, but is not limited to, "insurance industry practices in similar circumstances, expert testimony . . ., the defendant's own evaluation of the plaintiff's claim, and advice given to the insurance company on the probability of success at trial." O'Leary-Alison, 52 Mass. App. Ct. at 217 n. 3, 752 N.E.2d at 798 n. 3.

In the instant case, a reasonable person viewing the evidence available to AmWINS during the six-month period at issue would not have concluded that Hache's damages were reasonably clear.  Prior to the mediation, AmWINS received a liability and damages analysis from Hamel Marcin, which included a detailed description of the evidence in the Underlying Action, as well as opinions regarding Wachusett's potential liability and an assessment of a potential settlement range.  (Pl. Ex. 12).  Therein, defense counsel highlighted the opinions of a neuropsychologist who had been retained by Wachusett as an expert witness and disputed Alex's claims of long-lasting effects from his accident, both with respect to his physical injuries and with respect to his cognitive symptoms.  (Id. at 9-10).  Although Hamel Marcin raised concerns about Feeley's misconduct and its potential impact on Wachusett's credibility at trial, it also noted that the Haches had incurred only about $50,000 in medical bills as a result of Alex's injuries, and it advised AmWINS that Hache's claims about Alex's neuropsychological impairments resulting from his accident were "exaggerated and unsupported by the evidence." (Id. at 8, 14-15).  Thus, Hamel Marcin alerted AmWINS to the heavily disputed nature of Alex's alleged injuries and damages.

Other material that AmWINS reviewed in the weeks prior to the mediation warrant the conclusion that damages were far from clear at that time.  For example, in March 2018, AmWINS received a "Trial log" from Linda Demeritt in the MountainGuard Program.  (Pl. Ex. 7

at CM/ECF Pages 8-11 of 27).  The Trial log provided that "[l]iability is likely" but also noted that

Alex had experienced a "[g]ood recovery" from his accident and that "disagreement exists over

the nature and extent of damages/claim value[.]"  (PF ¶ 24; AR ¶ 24; DR ¶ 24).  During that

same month, AmWINS received a Confidential Mediation Overview from Hamel Marcin, which

had been provided to the mediator ahead of the April 3, 2018 mediation.  (PF ¶ 16; Pl. Ex. 13 at

CM/ECF Page 5 of 5).  Therein, defense counsel wrote that "Wachusett adamantly disputes

both liability and the nature and extent of the Plaintiff's alleged damages."  (Pl. Ex. 13 at

CM/ECF Page 1 of 5).  Hamel Marcin also attached a copy of its October 30, 2017 liability and

damages analysis, which contained the basis for its assertion regarding the plaintiff's damages

claim.  (Id. at CM/ECF Page 5 of 5).  Accordingly, the undisputed facts show that as of the time

of the mediation, damages were highly contested and AmWINS had a good faith basis for

concluding that liability remained unclear.

The evidence regarding the following six months supports the same conclusion.  The

undisputed facts establish that the parties to the Underlying Action continued to engage in the

development of expert testimony regarding their opposing positions with respect to Alex's

injuries and damages.  For example, but without limitation, while Hache's neuropsychologist,

Dr. McGrath, determined that Alex had likely "sustained permanent brain injury" and resulting

symptoms due to his fall from the chairlift (Pl. Ex 9 at CM/ECF Page 26 of 27), Wachusett's

neurology expert, Dr. Sarfaty, produced a report in which he opined that Alex had sustained no

brain injury or suffered any psychological impairment as a result of the incident.  (AmWINS SOF

¶ 39).  Additionally, in August 2018, Hamel Marcin provided AmWINS with an updated liability

and damages analysis in which it highlighted the significant damages issues presented in the

[50]

case.  (AmWINS Ex. O at 17-19).  Therein, Hamel Marcin described Alex's alleged injuries as "exaggerated and entirely unsupported by any objective evidence[,]" including the medical records and Alex's own deposition testimony.  (See id.).  It also noted that billing records continued to reflect only about $50,000 in medical costs, emphasized the disparity between Hache's $9 million settlement demand and defense counsel's evaluation of the case, and described the Underlying Action as a "battle of the experts."  (Id. at 19-21).  Although Hamel Marcin continued to express concern about the impact of Feeley's misconduct on Wachusett's potential liability at trial, defense counsel gave AmWINS no reason to believe that the parties' respective views of Alex's injuries and damages had changed or that damages had become clear.

The fact that the insurers increased the reserve on Hache's claim to $500,000 in early November 2018 does not support a different conclusion with respect to the plaintiff's damages. Although a raise in a liability reserve "suggests that the insurer reasonably recognized that its liability had become more likely[,] . . . it does not mean that liability has become 'reasonably clear' as to both fault and damages."  Bohn, 922 F. Supp. 2d at 147.  Here, it is undisputed that the increase did little to close the wide gap between the parties' respective views of the potential damages.  At the time of the increase, Wachusett had proposed to stipulate to liability at the trial of the Underlying Action, with the goal of keeping evidence of Feeley's misconduct out of case, while continuing to dispute "the nature, extent and severity of the Plaintiff's claimed injuries as well as the causal relationship of the Plaintiff's injuries to [Alex's] accident." (AmWINS SOF ¶ 43; AmWINS Ex. R).  Furthermore, it is undisputed that Hache rejected Wachusett's settlement offer of $425,000, which was set forth in a November 6, 2018 Offer of

Judgment, and was unwilling to reduce his demand below $5 million.  (See AmWINS Exs. C at 4-5 & S; AmWINS SOF ¶ 45).  There is no indication that the parties' experts had changed their opinions regarding the nature and extent of Alex's physical and cognitive injuries.  Nor do the facts indicate that there were other developments in the Underlying Action that clarified Wachusett's potential liability for Hache's damages.

Finally, "[a]n insurer's good faith, but mistaken, valuation of damages does not constitute a violation of c. 176D."  O'Leary-Alison, 52 Mass. App. Ct. at 218, 752 N.E.2d at 799, and cases cited.  Here, it is undisputed that AmWINS' assessment of Alex's injuries and valuation of damages throughout the relevant time period was within industry standards.  (See AmWINS Supp. Ex. B at 28-32).  Accordingly, Hache cannot establish that AmWINS was unreasonable or failed to act in good faith.  Because the record establishes that a good faith dispute over Hache's alleged damages existed throughout the period between the April 3, 2018 mediation and Wachusett's $425,000 settlement offer, and Wachusett's liability therefore remained unclear, this court recommends that AmWINS' motion for summary judgment be allowed and that Hache's cross-motion for summary judgment against AmWINS be denied.[13]

## V.   ANALYSIS -- CROSS-MOTIONS FOR SUMMARY JUDGMENT ON HACHE'S CLAIMS AGAINST AIG AND AMWINS

AIG and Granite State have moved for summary judgment on Hache's claims, set forth in Counts I and III of the First Amended Complaint, that the defendants violated Chapter 93A by willfully or knowingly engaging in unfair claim settlement practices in violation of Chapter 176D

---

[13] In light of this court's conclusion that AmWINS is entitled to summary judgment on Hache's claims for unfair claim settlement practices, it is not necessary at this time to address Hache's claim that AmWINS' violation of Chapter 93A was willful or knowing.  This court will address that claim in the event the District Judge to whom this case is assigned deems it necessary at a latter point in the litigation.

§§ 3(9)(d) and (f).  (See FAC ¶¶ 40, 52).  The defendants argue that they are entitled to summary judgment on the following three grounds: first, the defendants argue that AIG cannot be held liable for unfair claim settlement practices because it did not handle Hache's claim under the Primary Policy; second, they argue that liability was never reasonably clear in light of the parties' good faith dispute over Hache's damages; and third, the defendants contend that there are no facts to support Hache's claim that they engaged in a knowing or willful violation of their statutory obligations.  (AIG Am. Mem. at 8).  The defendants also argue that the record does not support Hache's claim that Granite State or AIG failed to conduct a reasonable investigation because it is undisputed that AmWINS handled the investigation in connection with Hache's claim under the Primary Policy and Hache has not identified any investigatory steps that the defendants did not pursue.  (Id. at 14; AIG Reply Mem. at 7-8).[14]  Hache has opposed the defendants' motion and disputes each of the arguments raised by AIG and Granite State.  Additionally, Hache has cross-moved for summary judgment with respect to his claims against AIG.  For the reasons that follow, this court finds that AIG and Granite State are entitled to summary judgment on Counts I and III because Hache has failed to present sufficient evidence to support a claim against either defendant for failure to carry out a reasonable investigation or to show that damages were reasonably clear prior to Wachusett's offer of the Primary Policy limit.[15]

_____

[14] "AIG Reply Mem." refers to the Consolidated Reply of Granite State Insurance Company and AIG Claims to Plaintiff's Opposition to their Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment on Count III of the First Amended Complaint (Docket No. 181).

[15] This court finds it unnecessary, at this stage in the proceedings, to address AIG's argument that it cannot be held liable because it did not participate in the handling of Hache's claim, or to address

### A. __Alleged Failure to Investigate__

As described above, Hache claims that AIG and Granite State violated Chapter 176D §
3(9)(d) by failing to conduct a reasonable investigation of his claim against Wachusett.  This
court finds that the defendants are entitled to judgment as a matter of law on these claims.  As
an initial matter, it is undisputed that during the relevant time period, AmWINS served as the
Third Party Administrator under the CSA and was responsible for carrying out claims
investigations on behalf of Granite State.  (See AIG SOF ¶ 5; AIG Ex. 3 at CM/ECF Pages 4-5 of
46).  It is also undisputed that AmWINS investigated Hache's claim throughout the time period
relevant to this case.  (See AmWINS SOF ¶ 3; AmWINS Ex. C; Pl. Ex. 30).  As described above, the
undisputed facts establish that AmWINS' investigation was reasonable and did not constitute
an unfair claim settlement practice.

Nevertheless, Hache argues that AIG "disregarded its duty to conduct a reasonable
investigation of Alex's claim that he continued to have chronic pain associated with the five
vertebral fractures and pelvic fracture, and instead continued to maintain the position that Alex
had a 'good recovery' from the injuries he sustained in the fall, without any reasonable basis for
doing so[.]"  (Pl. Opp. to AIG at 21).[16]  This argument provides no support for the plaintiff's
claim that AIG and Granite State failed to perform a reasonable investigation.  It is undisputed
that as of late November 2018, all of the defendants, including AmWINS, were aware of the

---

Hache's claim that Granite State's and AIG's statutory violations were willful or knowing.  This court will
address those matters if the District Judge determines it is necessary to do so.

[16] "Pl. Opp. to AIG" refers to the Plaintiff's Opposition to Defendant AIG Claims, Inc.'s Motion for
Summary Judgment; and Plaintiff's Cross-Motion for Summary Judgment on Count III of the First
Amended Complaint (Docket No. 164).

plaintiff's claim that Alex was suffering from ongoing and persistent back pain as a result of his back injuries and did not experience a good recovery with respect to his orthopedic injuries or his alleged traumatic brain injury.  (See Pl. Ex. 7 at 1).  However, the undisputed facts also demonstrate that the insurers' failure to credit Hache's claim regarding the nature and extent of Alex's injuries was due to their view of the evidence rather than their failure to conduct a reasonable investigation.  As Mr. Creamer wrote in an MLR that was approved on March 1, 2019, "[o]ur medical experts opine [that Alex] has fully recovered from his physical injuries & does not have a TBI" while the plaintiff's "experts opine he still has pain from his physical injuries & his brain injury will continue to have an impact on his education & vocational performance."  (Pl. Ex. 27 at CM/ECF Page 1 of 2).  Because Hache has presented no evidence showing that Granite State and AIG failed to inquire or gather information about Hache's injuries, and has identified no other "lines of inquiry that went unpursued," this court concludes that the defendants are entitled to summary judgment on his claim against them for failure to carry out a reasonable investigation.  See Scott, 2011 WL 4436984, at *13.

B.  **Whether Liability and Damages Became Reasonably Clear**

AIG and Granite State have moved for summary judgment with respect to Hache's claims against them for failure to effectuate a settlement once Wachusett's liability became reasonably clear.  Hache opposes Granite State's motion and has cross-moved for summary judgment against AIG on this issue.  Hache argues that "AIG Claims' failure to make a prompt and reasonable offer of settlement after February 5, 2019 when liability was reasonably clear constitutes a violation of its duty under c. 176D as a matter of law" and warrants a ruling in his

favor.  (Pl. Reply to AIG at 9).[17]  The defendants contend that during the relevant time period,

there "existed a genuine, good faith dispute concerning the plaintiff's alleged damages[.]"  (AIG

Am. Mem. at 8).  Therefore, the critical question with respect to these claims is whether, during

the time period from February 5, 2019 to July 1, 2019, when Wachusett proposed to settle the

Underlying Action for $1 million, "[AIG] reasonably believed that its insured's liability with

respect to damages was not clear."  O'Leary-Alison, 52 Mass. App. Ct. at 217, 752 N.E.2d at 798.

This court finds that the undisputed facts relating to this issue support summary judgment in

favor of the defendants.

Hache argues that "[a]s of February 5, 2019, when AIG Claims approved the reserve

increase on the Granite State primary policy to $1 million, Wachusett['s] fault for the accident

was reasonably clear."  (Pl. Opp. to AIG at 13).  This argument is premised upon Hache's

assertion that insurers have an obligation to effectuate settlement for the undisputed portion

of the damages, even though other portions are contested.  (See id. at 9-10).  As described

above, this assertion is incorrect.  Massachusetts law holds that an insurer is "not required to

put a fair and reasonable offer on the table until liability and damages [are] apparent."  Bobick,

439 Mass. at 659, 790 N.E.2d at 659.  Therefore, Hache has not shown that AIG and Granite

State violated Chapter 176D on this basis.

In any event, the record demonstrates that damages remained unclear throughout the

time period relevant to Hache's claims against these defendants.  The undisputed facts

---

[17] "Pl. Reply to AIG" refers to the Plaintiff's Reply to Granite State Insurance Company and AIG Claims, Inc.'s Opposition to Plaintiff's Cross-Motion for Summary Judgment on Count III of the First Amended Complaint.  (Docket No. 196).

demonstrate that at the time AIG approved AmWINS' request to increase the reserve on the Primary Policy, AIG believed liability was likely in light of the evidence relating to Feeley's misconduct.  (See Pl. Ex. 23).  Additionally, Attorney Shea at Hamel Marcin had advised AIG that the jury could return a verdict in the mid-seven figures once it learned about the misconduct. (See id.; Pl. Ex. 7 at CM/ECF Page 3 of 27).  However, this evidence does not alter the fact that Alex's injuries and resulting damages remained heavily contested.  As an initial matter, Attorney Shea did not suggest that there had been any change in his assessment that Alex's alleged injuries were "exaggerated and entirely unsupported by any objective evidence."  (See AmWINS Ex. O at 17).  Moreover, AIG's approval of the reserve increase did not alter the opinions of Wachusett's expert witnesses, who disputed Hache's claims regarding Alex's physical and cognitive injuries.  (See Pl. Ex. 27 at CM/ECF Page 1 of 2).  As described above, in an MLR that AIG approved with respect to the Excess Policy on March 1, 2019, nearly a month after AIG approved the reserve increase on the Primary Policy, Mr. Creamer wrote that Wachusett's "medical experts opine [that Alex] has fully recovered from his physical injuries & does not have a TBI."  (Id.).  Thus, while the reserve increase may have reflected the insurer's belief that liability had become likely, it did "not mean that liability had become 'reasonably clear' as to both fault and damages."  Bohn, 922 F. Supp. 2d at 147.

The record also demonstrates that during the time period from February 5, 2019 to May 2019, nothing significant changed with respect to the parties' views of Hache's injuries or his objective damages.  (See Pl. Ex. 29 at 90 (stating that as of May 2019, AIG understood that Alex had $51,000 in medicals bills, some broken bones and a concussion from which he appeared to have recovered)).  In an email that was sent to both West and Mr. Creamer on May 6, 2019,

Attorney Sweet expressed his view that while he remained concerned that Feeley's misconduct "could create a situation where a jury seeks to 'punish' Wachusett with a 7-figure verdict[,]" "the objective value of the case is not necessarily in the 7-figures." (Pl. Ex. 7 at CM/ECF Page 21 of 27). Additionally, on May 17, 2019, Attorney Sweet informed AmWINS and AIG that during discussions with Hache's counsel regarding the possibility of a second mediation, Hache's counsel had moved away from his reduced settlement demand of $5 million and returned to his initial settlement demand of $9 million based on the assertion that Alex's injuries had worsened. (Id. at CM/ECF Page 22 of 27). Attorney Sweet further informed AmWINS and AIG that defense counsel had seen no evidence to substantiate that claim. (Id.). While an excessive demand on the part of the claimant "do[es] not relieve an insurer of its statutory duty to extend a prompt and equitable settlement once liability and damages are reasonably clear[,]" there can be no reasonable dispute that the nature and extent of Alex's injuries and resulting damages remained unclear at that time. See Bobick, 439 Mass. at 662, 790 N.E.2d at 660-61.

The record demonstrates that a turning point in the defendants' assessment of the damages did not occur until June 2019, after AIG had a chance to evaluate Hache's production of additional medical records regarding Alex's orthopedic and cognitive injuries, as well as two new reports from Hache's experts, Dr. Stillman and Dr. Whitelaw. (See AmWINS SOF ¶¶ 57-59; Pl. Ex. 29 at 89-91). At that point, Wachusett had also retained an additional expert, Dr. Werger, who agreed with Hache's claim that Alex's orthopedic injuries from the March 8, 2015 accident were continuing to cause him to suffer back pain and pain in his right hip. (AmWINS Ex. X at CM/ECF Pages 297-98 of 373). According to Mr. Creamer, the newly produced medical information caused him to change his evaluation of Hache's claim and led AIG and AmWINS to

offer Hache a $1 million structured settlement.  (See Pl. Ex. 29 at 89-91; PF ¶¶ 70-71; AR ¶ 70; DR ¶ 70).  While it is not clear why, at that point, AIG and AmWINS decided to disregard the evidence from Drs. Hebben and Sarfaty, who opined that Alex had fully recovered from his physical injuries and suffered no TBI (see Pl. Ex. 12 at 9-10; AmWINS Ex. M; AmWINS SOF ¶ 39), it is undisputed that within days after both AIG and AmWINS agreed to offer the limit of the Primary Policy, Wachusett presented Hache's counsel with the $1 million structured settlement proposal.  (See PF ¶¶ 70-71; AR ¶ 70; DR ¶ 70).

In sum, the record demonstrates that throughout the time period from February 5, 2019 through the insurers' $1 million settlement offer, the extent of Hache's injuries and damages remained the subject of good faith disagreement.  Because Hache cannot show that Wachusett's liability was reasonably clear such that AIG and Granite State had a duty to effectuate settlement, this court recommends that the defendants' motion for summary judgment be allowed and Hache's cross-motion for summary judgment against AIG be denied.

## VI.    CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the "Defendants' Motion for Summary Judgment" (Docket No. 153) and "AmWINS Program Underwriter, Inc.'s Motion for Summary Judgment" (Docket No. 157) be ALLOWED and that Hache's cross-motions for summary judgment (Docket Nos. 163, 164 &

179) be DENIED.[18]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[18] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days after being served with this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).